## In re IBP, INC. SHAREHOLDERS LITIGATION.

**IBP, Inc., Defendant and Cross–Claim Plaintiff, and Counterclaim Defendant,**

v.

**Tyson Foods, Inc. and Lasso Acquisition Corporation, Defendants, Cross–Claim Defendants and Counterclaim Plaintiffs.**

Civil Action No. 18373.

Court of Chancery of Delaware, New Castle County.

Submitted: June 3, 2001.
Decided: June 15, 2001.
Corrected: June 18, 2001.

Joseph A. Rosenthal, Esquire, of Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware; Of Counsel: Stanley D. Bernstein, Esquire, of Bernstein Liebhard & Lifshitz, New York, New York, Attorneys for Plaintiffs.

William D. Johnston, Christian Douglas Wright, Danielle B. Gibbs, Esquires, of Young Conaway Stargatt & Taylor, Wilmington, Delaware; Of Counsel: Bernard W. Nussbaum, Peter C. Hein, Kenneth B. Forrest, Eric M. Roth, Marc Wolinsky, George T. Conway, III, Elaine P. Golin, Don W. Cruse, Jr., Esquires, of Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Defendants John J. Jacobson, Jr., Wendy L. Gramm, Martin A. Massengale, Michael L. Sanem and Jo Ann R. Smith, and Defendant and Cross–Claim Plaintiff and Counterclaim Defendant IBP, Inc.

Anthony W. Clark, Robert S. Saunders, Martina Bernstein, Julie A. Tostrup, Kara R. Yancey, Darryl A. Parson, Esquires, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware; of Counsel: Matthew R. Kipp, Vincent P. Schmeltz III, Ryan J. Rohlfsen, Cyrus Amir–Mokri, Esquires, of Skadden, Arps, Slate, Meagher & Flom; James B. Blair, Esquire, of Law Offices of James B. Blair, Springdale, Arkansas; Jennifer Hendren, Esquire, of Hendren Law Firm, Fayetteville, Arkansas; Kenneth R. Shemin, Esquire, of Shemin Law Firm, Fayetteville, Arkansas; Ruth Ann Wisener, Esquire, of Conner & Winters, Fayetteville, Arkansas; Attorneys for Defendants and Counterclaim Plaintiffs Tyson Foods, Inc. and Lasso Acquisition Corporation.

## OPINION

STRINE, Vice Chancellor.

This post-trial opinion addresses a demand for specific performance of a "Merger Agreement" by IBP, Inc., the nation's number one beef and number two pork distributor. By this action, IBP seeks to compel the "Merger" between itself and Tyson Foods, Inc., the nation's leading chicken distributor, in a transaction in which IBP stockholders will receive their choice of $30 a share in cash or Tyson stock, or a combination of the two.

The IBP–Tyson Merger Agreement resulted from a vigorous auction process that pitted Tyson against the nation's number one pork producer, Smithfield Foods. To say that Tyson was eager to win the auc-

tion is to slight its ardent desire to possess IBP. During the bidding process, Tyson was anxious to ensure that it would acquire IBP, and to make sure Smithfield did not. By succeeding, Tyson hoped to create the world's preeminent meat products company—a company that would dominate the meat cases of supermarkets in the United States and eventually throughout the globe.

During the auction process, Tyson was given a great deal of information that suggested that IBP was heading into a trough in the beef business. Even more, Tyson was alerted to serious problems at an IBP subsidiary, DFG, which had been victimized by accounting fraud to the tune of over $30 million in charges to earnings and which was the active subject of an asset impairment study. Not only that, Tyson knew that IBP was projected to fall seriously short of the fiscal year 2000 earnings predicted in projections prepared by IBP's Chief Financial Officer in August, 2000.

By the end of the auction process, Tyson had come to have great doubts about IBP's ability to project its future earnings, the credibility of IBP's management, and thought that the important business unit in which DFG was located—Foodbrands— was broken.

Yet, Tyson's ardor for IBP was such that Tyson raised its bid by a total of $4.00 a share after learning of these problems. Tyson also signed the Merger Agreement, which permitted IBP to recognize unlimited additional liabilities on account of the accounting improprieties at DFG. It did so without demanding any representation that IBP meet its projections for future earnings, or any escrow tied to those projections.

After the Merger Agreement was signed on January 1, 2001, Tyson trumpeted the value of the merger to its stockholders and the financial community, and indicated that

it was fully aware of the risks that attended the cyclical nature of IBP's business. In early January, Tyson's stockholders ratified the merger agreement and authorized its management to take whatever action was needed to effectuate it.

During the winter and spring of 2001, Tyson's own business performance was dismal. Meanwhile, IBP was struggling through a poor first quarter. Both companies' problems were due in large measure to a severe winter, which adversely affected livestock supplies and vitality. As these struggles deepened, Tyson's desire to buy IBP weakened.

This cooling of affections first resulted in a slow-down by Tyson in the process of consummating a transaction, a slow-down that was attributed to IBP's on-going efforts to resolve issues that had been raised about its financial statements by the Securities and Exchange Commission ("SEC"). The most important of these issues was how to report the problems at DFG, which Tyson had been aware of at the time it signed the Merger Agreement. Indeed, all the key issues that the SEC raised with IBP were known by Tyson at the time it signed the Merger Agreement. The SEC first raised these issues in a faxed letter on December 29, 2000 to IBP's outside counsel. Neither IBP management nor Tyson learned of the letter until the second week of January, 2001. After learning of the letter, Tyson management put the Merger Agreement to a successful board and stockholder vote.

But the most important reason that Tyson slowed down the Merger process was different: it was having buyer's regret. Tyson wished it had paid less especially in view of its own compromised 2001 performance and IBP's slow 2001 results.

By March, Tyson's founder and controlling stockholder, Don Tyson, no longer

wanted to go through with the Merger Agreement. He made the decision to abandon the Merger. His son, John Tyson, Tyson's Chief Executive Officer, and the other Tyson managers followed his instructions. Don Tyson abandoned the Merger because of IBP's and Tyson's poor results in 2001, and not because of DFG or the SEC issues IBP was dealing with. Indeed, Don Tyson told IBP management that he would blow DFG up if he were them.

After the business decision was made to terminate, Tyson's legal team swung into action. They fired off a letter terminating the Agreement at the same time as they filed suit accusing IBP of fraudulently inducing the Merger that Tyson had once so desperately desired.

This expedited litigation ensued, which involved massive amounts of discovery and two weeks of trial.[1]

In this opinion, I address IBP's claim that Tyson had no legal basis to avoid its obligation to consummate the Merger Agreement, as well as Tyson's contrary arguments. The parties' extensive claims are too numerous to summarize adequately, as are the court's rulings.

At bottom, however, I conclude as follows:

- The Merger Agreement and related contracts were valid and enforceable contracts that were not induced by any material misrepresentation or omission;

- The Merger Agreement specifically allocated certain risks to Tyson, including the risk of any losses or financial effects from the accounting improprieties at DFG, and these risks cannot serve as a basis for Tyson to terminate the Agreement;

- None of the non-DFG related issues that the SEC raised constitute a contractually permissible basis for Tyson to walk away from the Merger;

- IBP has not suffered a Material Adverse Effect within the meaning of the Agreement that excused Tyson's failure to close the Merger; and

- Specific performance is the decisively preferable remedy for Tyson's breach, as it is the only method by which to adequately redress the harm threatened to IBP and its stockholders.

## I. Factual Background

### IBP's Key Managers

IBP was first incorporated in 1960. Its current Chairman of the Board and Chief Executive Officer, Robert Peterson, has been with the company from the beginning. Having started in the cattle business as a cattle driver, Peterson learned the business from the ground up and has been the strategic catalyst behind IBP's

1. This lawsuit started as a challenge by stockholder plaintiffs to an earlier leveraged buyout of IBP. The plaintiffs then drew fire on the Tyson Merger, contending it was unfair, too. When the Tyson Merger went away, IBP quickly moved for specific performance. The stockholder plaintiffs had the "flexibility" to adapt to these events and have decided that the Tyson Merger is the best deal and should be enforced. The stockholder plaintiffs thus join in the arguments made by IBP, but have let IBP take the lead on behalf of the company and its stockholders. The stockholder plaintiffs were present at trial, but allowed IBP's counsel to present their case.

The parties agreed to expedite the trial on the merits and the question of whether specific performance was appropriate, and to defer any issues of damages. This approach was designed to ensure that the passage of time would not preclude IBP's chance at specific performance. For reasons that the opinion suggests, it may be that any damages issue has largely been obviated, depending on the parties' cooperation and the outcome on appeal.

growth from a relatively small fresh beef business to a diversified food company with sales of over $15 billion annually.

Peterson is a strong and committed CEO, who loves the business he has helped build and the people who work for it. By the late 1990s, however, Peterson was in his late sixties and cognizant that it would soon be time to turn the reins over to a new CEO. Peterson's heir apparent was IBP's President and Chief Operating Officer, Richard "Dick" Bond. By 2000, Peterson had also installed one of his top aides, Larry Shipley, as IBP's Chief Financial Officer. Sheila Hagen was IBP's General Counsel, having joined the company from one of its beef industry rivals.

Although this quartet all have important roles in the company, it is clear that Peterson remains the dominant manager at IBP, and that Bond is the next most important. Shipley and Hagen, however, each have important duties regarding financial and legal functions at issue in this case. As in any organization, the roles of the four overlapped, but imperfectly so. Put less obliquely, it is common for "big picture" executives to view and speak about issues from a larger strategic perspective that is less specific and technically precise than executives like CFOs and General Counsels who are charged with getting the details precisely right.

### IBP's Business

The traditional business of IBP is being a meat processor that acts as the middleman between ranchers and retail supermarkets and food processors. This is the so-called "fresh meats" business of IBP. Over the years, that business has evolved in sophistication so that just about every inch of the animals eventually can be processed by IBP or a later purchaser into something useful. The fresh meats business has also gotten more and more pre-cise in terms of slaughtering. Whereas very large sections of animals used to be shipped to end-users, the industry trend is for middlemen like IBP to do more of the cutting.

As of 2000, IBP was on the verge of taking that strategy to its next level. Instead of shipping large sections of meat to stores for further butchering, IBP was preparing to butcher meat itself, which would be shipped "case ready"—that is, ready to be put into the supermarket case. This was a new endeavor that was hoped to yield higher margins and reduce the overall cyclicality of IBP's business.

Likewise, IBP was endeavoring to build up its food processing businesses. These are the businesses that take raw food products and turn them into something canned or packaged for supermarket or restaurant sale. Because these processing activities "add value," they tend to have higher profit margins and generate more stable earnings than middleman meat slaughtering.

To carry out this strategy, IBP had recently made a series of acquisitions, including the purchase of Corporate Food Brands America, Inc. ("CFBA") in February 2000. These purchased entities were being put together within IBP under the larger heading of Foodbrands. The companies make a variety of products, such as pizza toppings and crusts, side dishes, sauces, condiments, and portion-controlled meat products. IBP was also intent on promoting a branded line of lunch meat and similar products under the name "Thomas E. Wilson."

IBP hoped that these processed food investments would provide a vehicle for growth and reduce the year-to-year volatility of IBP's earnings. Given that most of the acquired companies within Foodbrands had been purchased no earlier than 1998,

IBP was obviously quite early in executing this yet-to-be fully proven strategy.

Moreover, while Foodbrands was a central part of IBP's strategy for the future, it remained at that time a much smaller contributor to the bottom line than IBP's fresh meats business. As originally reported, for example, fiscal year ("FY") 1999 sales for IBP's fresh meats business were $12.4 billion as opposed to $1.7 billion for Foodbrands.[2] Similarly, FY 1999 operating earnings in the fresh meats business were $438 million as opposed to $90 million for Foodbrands.[3] Thus, while Foodbrands had a higher profit margin, fresh meats remained by far the most substantial part of IBP's business.

### IBP Management Proposes An LBO

During 1999 and early 2000, IBP's management was frustrated by the stock market's valuation of the company's stock. As earnings-less dot.coms traded at huge multiples to eyeball hits, IBP's stock traded at a relatively small multiple to actual earnings. In response to this problem, Peterson, Bond, and Shipley were receptive when the investment bank of Donaldson, Lufkin & Jenrette, Inc. ("DLJ") expressed interest in a leveraged-buy out ("LBO") of the company.

In July, management informed the IBP board that it would like to pursue an LBO seriously. With the help of DLJ, a syndicate of investors who called themselves "Rawhide" was prepared to take the company private if a deal could be negotiated with the IBP board. The board formed a special committee comprised of outside directors, who then selected Wachtell, Lipton, Rosen & Katz as its legal advisor and J.P. Morgan Securities, Inc. as its financial advisor.

To facilitate their work, the special committee and J.P. Morgan asked IBP management to develop a set of five-year projections for the performance of IBP, which I will call the "Rawhide Projections" or the "Projections." This request put the IBP management in the position of performing a task that was relatively novel to them. While IBP had periodically prepared two to three-year projections for rating agencies, it was not accustomed to making five-year projections. Even more important, it did not utilize such long-term projections in its own business operations.

To the contrary, IBP generally created plans for the coming year. In the fresh beef part of the business, these plans were quite ambitious and designed to motivate excellent performance, rather than to be predictive of actual results. The plans for the processed foods part of the business were designed to be more predictive, but these plans also dealt with the part of the business that was newest, and that included several units that had been recently purchased by IBP.

Several other factors made it difficult to project IBP's performance accurately. Although IBP was executing a strategy to diversify its business so as to be less dependent on its fresh meats business, the reality was that fresh meats was still the core of the company, constituting well over 80% of its sales and earnings in 1999. Not only that, IBP's processed foods division used fresh meats heavily.

As a middleman processor of fresh meats, IBP purchases cows and hogs at market prices, slaughters them, and sells them to food retailers and food processors. IBP's profit margins are quite tight. When live stock supplies are low, these margins shrink further. When livestock

---

2. PX 27, at IBP2000184. 3. *Id.*

supplies are plentiful, IBP is more profitable.

Cattle and hog supplies go through cycles that can be tracked with some general precision using information from the United States Department of Agriculture. These cycles are affected by actual demand and ranchers' expectations of market demand, as well as the need at various points to hold animals back to build up herds. Livestock supply is also heavily weather-driven. Ranchers are paid more money for large animals, from which more meat can be butchered. Cold weather makes it difficult for ranchers to grow the animals to the point where they will sell for the optimal price. When a severe winter hits, ranchers may hold animals back, so that they can be sold later after having been grown to more profitable sizes.

IBP's Foodbrands business was also affected by fluctuations in livestock pricing, because it uses fresh meats as raw material. While Foodbrands has a relatively greater ability to make up for any shortage in livestock than the fresh meats part of IBP, Foodbrands also suffers when livestock supplies are tight and is unable to pass on its increased costs immediately. Instead, it hopes to regain its reduced margins within a reasonable time.[4]

For all these reasons, IBP's management was wary of preparing a five-year projection, but did so. The task fell largely to Shipley as CFO. His methodology was sound and reasonable, if not scientific.

In sum, Shipley's August, 2000 Rawhide Projections assumed as follows:

- *Fresh Meats:*
 - ▲ *Beef:* Shipley estimates for FY 2000 profitability ("EBIT[5] per head") and volume were based on first-half results and projected to continue through the rest of the year. Thus, he projected EBIT per head of $27.50. But Shipley assumed a sharp decline in EBIT per head in 2001 to $16.50 per head, and a further decline in 2002 to $15.00, and a modest increase from 2003 to 2005. Profitability during this period was expected to remain fairly flat.[6] Shipley based his estimates on an expected trough in the cattle cycle, in view of historical trends.
 - ▲ Pork: Shipley used the same per-head EBIT figure for all five years, derived from IBP's historical average, with a slight upward adjustment for industry rationalization. Overall EBIT fluctuated, but was fairly steady throughout.
- *Logistics/Other:* This category deals with IBP's trucking and freezer businesses. Shipley simply assumed that FY 2000 estimated profits would be repeated in each of the projected years because it was a stable business.
- *Case Ready:* Shipley used management's existing assumptions. These projected losses for 2000 and 2001, and profitability in years 2002–2005.

---

4. This is a simplification of a very complex issue that involves the timing of Foodbrands' purchase of livestock at certain costs and the timing of its sale of finished product, and the pricing of those respective transactions, among other factors. The simplicity of this rendering also applies to the overall discussion of IBP's susceptibility to changes in livestock supply.

5. Typically, this is defined as Earnings Before Interest and Taxes, but has been used more loosely by the parties in this case. In this opinion, earnings from operations and EBIT are used interchangeably. They are the terms the companies have used to describe IBP's earnings.

6. PX 531, at T41054.

- *Foodbrands:* Shipley divided Foodbrands into three basic categories as follows:

 ▲ *Thomas E. Wilson*—Shipley assumed that IBP's venture into branded ready-to-eat or cooked meat products would lose money until 2003, when it would begin to be profitable.

 ▲ *IBP Foods*—This was a unit comprised of businesses that IBP had purchased out of bankruptcy. Shipley projected losses in 2000 and 2001, and profitability in the remaining years.

 ▲ *Other Foodbrands*—This was the heart of Foodbrands' business. Shipley assumed 2000 EBIT of $157 million with a steady growth rate of 8% for the remaining years.

The overall picture for Foodbrands therefore was a composite of these assumptions that had Foodbrands producing $125 million in EBIT in 2000, $137 million in 2001, and growing to nearly $300 million by 2005. The $125 million EBIT number excluded $42.5 million in one-time costs associated with IBP's acquisition of CFBA and the write-off of bad debt relating to a customer (together, the "CFBA Charges"). Shipley excluded the CFBA Charges because they were a non-recurring cost that was not expected to affect Foodbrands going-forward. All users of the Rawhide Projections relevant to this opinion were made aware of this feature of Shipley's analysis.

Shipley's assumptions were reasonable given the inherent imprecision of the task he was given. In reaching this conclusion, I also find that the Rawhide Projections were prepared with particular users in mind: a sophisticated special committee and investment bank that would understand that projections of this kind are at best a useful roadmap to where a business

may go if the assumptions used in the model pan out and if the company's business plan is executed well. Shipley reasonably assumed that the users of the Projections would approach them with the sort of intrinsic skepticism and caution that one expects from seasoned professionals, rather than with the unquestioning attitude of a believer at the foot of a prophet.

### The IBP Board Accepts A Bid From The Rawhide Group

After several months of negotiations, the Rawhide Group and the special committee struck a deal on October 1, 2000 whereby the Rawhide Group would purchase all of IBP's shares at $22.25 per IBP share. At a special committee meeting in connection with approval of the transaction, Peterson expressed his view that IBP's performance for the second half of the year was softening, and that overall EBIT for FY 2000 might be $500 to $525 million, a range that was lower than the Rawhide Projection estimate that had been performed in August.

The Rawhide deal was publicly announced the next day. By this time, rumors had been circulating within the financial community about the possibility of such a deal.

The announcement of the transaction inspired class action lawsuits in this court, alleging that the transaction was unfair. These suits were filed irrespective of the minimal barriers that existed to a higher transaction.

### Problems At DFG Foods Begin To Surface

In 1998, as part of its strategy to grow IBP's higher-margin food processing business, IBP management purchased a specialty hors d'oeuvres, kosher foods, and "airline food" business for $91 million, in-

cluding assumed debt. IBP bought this business from its managers, including its President, Andrew Zahn. Within IBP, the business became known as DFG Foods, Inc. or "DFG." In late 1999, IBP purchased a competitor of DFG named Wilton Foods, and combined its operations with DFG. Zahn stayed on board after the purchase of DFG and continued to run the business, with a right to certain earn-out payments upon his departure that were tied to the unit's performance.

Although IBP hoped that DFG would become a useful part of its overall strategy to move into higher-margin businesses, as of the year 2000, DFG was an insignificant portion of IBP's overall business. Before the drastic adjustments that I will discuss later, DFG's 1999 sales had been around $75 million and its pre-tax earnings were $8.2 million. At these levels, DFG constituted less than 1% of IBP's sales and less than 2% of its pre-tax earnings. While IBP employed around 50,000 people at over 60 production facilities, DFG employed approximately 300 workers at its two facilities.

On September 30, 2000, Andrew Zahn left DFG and took a sizable earn-out payment with him. On October 16, 2000, IBP issued a press release announcing earnings for the third quarter of FY 2000 of $83.9 million and year-to-date earnings of $203 million. Soon after this announcement, Dick Bond learned that there were problems with the integrity of DFG's books and records, and that it was possible that DFG's inventory value was overstated.

The evidence reveals that audit staff within the Foodbrands unit had harbored concerns about DFG's accounting procedures for some time. Dan Hughes, the director of internal audit at Foodbrands, had been questioning issues. His boss, Bill Brady, who was Foodbrands' CFO, had not taken these concerns as seriously,

and had resisted Hughes's suggestion to inform IBP's audit committee about possible overstatements. Despite Tyson's arguments to the contrary, there is no credible evidence that suggests that anyone in *IBP top management* were on notice about irregularities at DFG until mid-October 2000.

When IBP top management learned of the problems at DFG, a full inventory audit was ordered. The audit concluded that DFG's inventory was overvalued by $9 million. On November 7, 2000, IBP therefore announced that it would take a $9 million reduction over pre-tax earnings from the amounts previously reported for third quarter of FY 2000. These amounts were reported to the SEC in IBP's third quarter 10-Q. As of that time, Peterson and Bond were led to believe that the $9 million overstatement was the extent of the problem at DFG, although efforts to get control of DFG's financials continued.

### The Auction For IBP Begins

The rumors about IBP's possible sale had not gone unnoticed among meat industry leaders. Two industry participants had toyed with the idea of making a play for IBP for years.

One was Smithfield Foods, the nation's number one pork processing firm. When combined with IBP, Smithfield would be the number one producer of beef and pork products. The strength of the Smithfield–IBP combination was also its weakness. Because of IBP's own strength in pork, anti-trust and political concerns were bound to be raised about a merger. Nonetheless, those concerns did not impede Smithfield from making an unsolicited bid for IBP on November 12, 2000. The Smithfield bid offered $25 in Smithfield stock for each share of IBP stock. This was not the best of news for IBP manage-

ment, whose relationship with Smithfield management was not warm.

Meanwhile, Tyson Foods had been pondering a deal with IBP for several years. Bob Peterson and Tyson founder and controlling stockholder, Don Tyson, were old industry friends with great respect for one another. In the preceding year or so, Peterson had bantered with Don Tyson about the idea of putting Tyson and IBP together. This would create a company that was number one in beef and chicken, number two in pork, and that would have a diverse processed food business. Put mildly, Peterson's ardor for a combination with Tyson was much stronger than for a deal with Smithfield.

When Peterson spoke with him earlier, Don Tyson saw the potential of the combination, but had recently stepped aside as CEO to make way for a new management team, destined to be led by his son John Tyson. Don Tyson felt that the new team needed to settle in before undertaking such a big deal.

By November 2000, the new Tyson team had been putatively in charge for some time, and was led by John Tyson, the company's CEO. As a part of its active consideration of corporate strategy, Tyson management periodically ran numbers on the feasibility of a merger with IBP. By mid-November, Tyson was seriously considering making a play for IBP. Shortly before Thanksgiving, John Tyson received a call from George Gillett, a major IBP stockholder who was a participant in the Rawhide group. Gillett called to encourage Tyson to bid for IBP. By the time Gillett got to John Tyson, John Tyson was already quite receptive.

Soon after the call with Gillett, John Tyson called Dick Bond to set up a meeting to discuss a possible combination. The meeting was arranged for November 24, 2000 at an airport in Tampa due to the various Thanksgiving itineraries of the expected participants. The primary participants were to be Peterson and Bond for IBP, and Don and John Tyson for Tyson.

### The November 24 Meeting

The November 24 meeting was a love-fest. Tyson came ready to buy, and IBP came ready to be bought. The meeting was dominated by the two elder statesmen, Peterson and Don Tyson. Each was excited about the possibility of combining the companies, under the day-to-day leadership of John Tyson and Dick Bond. Don Tyson had even been dreaming about the companies' combined balanced sheets at bedtime.

The two discussed the combination in general, big picture terms with great enthusiasm. Peterson told the two Tysons that the Rawhide Projections would soon be published. He expressed confidence that performance of the kind indicated in the Projections could be achieved by IBP and that his own internal operating plans for IBP were more ambitious. But at no time did Peterson promise that IBP could be guaranteed to perform as the Projections predicted. Indeed, Peterson discussed many of the risk factors that affected IBP and that would naturally lead a reasonable listener to conclude that future results could not be projected with certainty. These risk factors included the cattle cycle, which Peterson explained was likely to be on the downside in the ensuing years.

The testimony suggests that the conversation was largely focused on the future and the synergistic benefits of the combination, and not as much on year 2000. While I have little doubt that Peterson expressed confidence in his company, I also conclude that he did not promise Tyson that IBP's FY 2000 results would be exactly as set forth in the Rawhide Projec-

tions. I do think Peterson felt that IBP would have a good year and projected that confidence. That is, I conclude that his subjective belief was fully in accord with the views he expressed to the Tysons.

I also conclude that Peterson felt that he was having a big picture conversation with savvy businessmen, who would be careful to absorb his larger thoughts against a backdrop informed by careful reading and examination of all the information usually considered by a corporation considering a mega-transaction. In this regard, I specifically conclude that a reasonable participant in the meeting would have assumed that the statements of all participants were general and in keeping with the informal and preliminary nature of the meeting. In talking about the Rawhide Projections that were to be released soon, the IBP participants would have naturally assumed that the Tysons would read them carefully and the information that qualified them. This assumption that Tyson Foods was proceeding cautiously and not heedlessly is borne out by record evidence that shows that Tyson was running its own assumptions about a combination, with downside cases.

As a result, I conclude that John and Don Tyson did not form a belief at the November 24 meeting that the Rawhide Projections were in the bank and would be met with ease. Instead, they took away the view that Peterson and Bond believed that IBP would meet those Projections, but that there were no guarantees of that

and that there were known risks that could compromise IBP's ability to deliver.

At a later point in the meeting, enthusiasm for the deal had run so high that the participants called in Tyson General Counsel Les Baledge, who had flown down with John Tyson, to discuss generally how the parties would proceed if Tyson made a bid.[7] By the end of the meeting, the Tysons were enthusiastic. Don Tyson ended the meeting by saying that the companies ought to be put together as quickly as possible.

### The Rawhide Projections Are Published

On November 28, 2000, the preliminary proxy statement for the Rawhide deal was filed with the SEC. The preliminary statement included a description of the Rawhide Projections. The statement included the Projections *"solely because of the disclosures [of them] that were made to J.P. Morgan"* during the negotiation process.[8] The preliminary proxy statement included a large amount of highlighted language that was intended to signal the caution with which those Projections should be used. A careful reader of the preliminary proxy would have noted, among other things, that: (i) the Projections had been prepared in August 2000; (ii) that the Projections had not been updated; (iii) that IBP Management does not ordinarily make such Projections; (iv) that the Projections should be read in light of IBP's most recent financial statements; (v) that there were a large number of risks that could affect whether the Projections would

---

**7.** Earlier in the litigation, Tyson leveled serious fraud allegation at IBP based on assertions by Baledge relating to the November 24 meeting. Baledge claimed to have been given access to a copy of the Rawhide Projections before the November 24 meeting as a fraudulent inducement by IBP to enter the bidding. The Arkansas court was told that this document would be a key one in this case. So

flimsy did this accusation turn out to be that it was not even made in Tyson's post-trial brief. Although Baledge sticks to his story, Tyson did not and Baledge's management colleagues have not. I do not credit Baledge's version of events, which is at best mistaken.

**8.** PX 531, at T41053 (emphasis added).

be met, particularly supply cycles in the livestock markets; and (vi) that the Projections were not guarantees of particular results.

By November 28, 2000, IBP had already issued its third quarter 10–Q. The preliminary proxy statement expressly informed readers that the Rawhide Projections— which had been made as of August 2000 and had not been updated—should be read in light of the third quarter 10–Q. The third quarter 10–Q contained information that suggested that IBP would have difficulty meeting the $542 million in EBIT predicted for the year 2000. By the end of the third quarter, IBP's total reported EBIT was $340 million, a result that trailed third quarter results for FY 1999 by $67 million.[9] Whereas the Rawhide Projections had assumed that Foodbrands would deliver EBIT of $125 million for full year 2000, Foodbrands had only delivered around $50 million as of the end of third quarter 2000 on a normalized basis.[10] *It thus needed to generate more EBIT in the fourth quarter than the whole of the preceding year to meet the Rawhide Projections' estimate.*

### Tyson Makes Its Opening Bid

In early December, the Tyson board of directors met to consider making a bid for IBP. John Tyson's vision for the deal was fundamental: he wanted to dominate the meat case of America's supermarkets and be the "premier protein center-of-the-plate provider" in the world.[11] Tyson/IBP would be number one in beef and chicken, and number two in pork. It would therefore be able to provide supermarkets with nearly all the meat they needed.

Not only that, John Tyson saw the potential to bring Tyson Foods' own experi- ence and unique expertise to bear outside of the poultry realm. As all parties agree, Tyson was an innovator in the meat industry, which had been the leader in demonstrating that a meat processor could produce value-added meat products of a ready-to-eat and ready-to-heat nature. In the past, meat processors sold large portions of meat to supermarkets and other processors, who butchered them and cooked them into higher priced serving sizes. Tyson began to do much of that work itself, thus preserving more of the profit for itself.

IBP was acknowledged to have a great fresh beefs business with an excellent, long-term track record. While it was beginning to embark on value-added strategies in the beef and pork industry, IBP was by all accounts not as far along in that corporate strategy and could most benefit from Tyson's expertise in that particular area. John Tyson saw the potential for Tyson's expertise to help IBP do in beef and pork what Tyson had done in poultry. His vision of the companies, however, had little to do with DFG specifically, a small subpart of Foodbrands that he knew little, if anything, about.

Tyson's board supported management's recommendation to make a bid. On December 4, 2000, Tyson proposed to acquire IBP in a two-step transaction valued at $26 (half cash, half stock) per share. Tyson trumpeted the fact that its offer was preferable to Smithfield's, in no small measure because Tyson did not face the same degree of anti-trust complications that Smithfield did and could thus deliver on its offer more quickly. To emphasize this point, Tyson said that its offer was "subject to completion of a quick, confirmatory

9. PX 40, at T40977.

10. *Id.* at T40988.

11. Tr. 41.

due diligence review and negotiation of a definitive merger agreement." [12]

To that end, Tyson sent IBP an executed "Confidentiality Agreement," modeled on one signed by Smithfield, which would permit it to have access to non-public, due diligence information about IBP. That Agreement contains a broad definition of "Evaluation Material" that states:

> For purposes of this Agreement, Evaluation Material shall mean *all* information, data, reports, analyses, compilations, studies, interpretations, projections, forecasts, records, and other *materials (whether prepared by the Company, its agent or advisors or otherwise), regardless of the form of communication, that contain or otherwise reflect information concerning the Company* that we or our Representatives may be provided by or on behalf of the Company or its agents or advisors in the course of our evaluation of a possible Transaction. [13]

The agreement carves out from the definition the following:

> This Agreement shall be inoperative as to those particular portions of the Evaluation Material that (i) become available to the public other than as a result of a disclosure by us or any of our Representatives, (ii) were available to us on a nonconfidential basis prior to the disclosure of such Evaluation Material to us pursuant to this Agreement, or (iii) becomes available to us or our Representatives on a non-confidential basis from a source other than the Company or its agents or advisors provided that the source of such information was not known by us to be contractually prohibited from making

such disclosure to us or such Representative. [14]

As plainly written, the Confidentiality Agreement thus defines Evaluation Material to include essentially all non-public information in IBP's possession, regardless of whether the company's employees or agents prepared it. The terms of the Confidentiality Agreement also emphasize to an objective reader that the merger negotiation process would not be one during which Tyson could reasonably rely on oral assurances. Instead, if Tyson wished to protect itself, it would have to ensure that any oral promises were converted into contractual representations and warranties. The Confidentiality Agreement does so by providing:

> We understand and agree that none of the Company, its advisors or any of their affiliates, agents, advisors or representatives (i) have made or make any representation or warranty, expressed or implied, as to the accuracy or completeness of the Evaluation Material or (ii) shall have any liability whatsoever to us or our Representatives relating to or resulting from the use of the Evaluation Material or any errors therein or omissions therefrom, except in the case of (i) and (ii), to the extent provided in any definitive agreement relating to a Transaction. [15]

### The Due Diligence Process Begins

Tyson did not enter into the due diligence process alone. It retained Millbank, Tweed, Hadley & McCoy as its primary legal advisor, Merrill Lynch & Co. as its primary financial advisor, and Ernst & Young as its accountants.

**12.** PX 63.

**13.** *Id.* (emphasis added).

**14.** *Id.*

**15.** *Id.*

The bidding process was being run by IBP's special committee. As members of the Rawhide group, Peterson, Bond and their subordinates were considered "interested" participants. Thus, while IBP management played a key informational role, the special committee had the final say.

On December 5 and 6, 2000, Tyson's due diligence team reviewed information in the data room at Wachtell, Lipton. Tyson soon learned that the data room did not contain certain information about Foodbrands and the reason why that was so: IBP was reluctant to share competitively sensitive information with Smithfield. The special committee's approach to this sales process was to treat the bidders with parity. As a result, Tyson was told that any information it wanted that was not in the data room could be provided, but that if Tyson received that information, so would Smithfield.

As a result of its due diligence, Tyson flagged certain items including:

- Possible asset impairments at DFG and certain other Foodbrands companies.[16]
- Discrepancies in the way that IBP reported its business segments.[17]
- Concerns regarding whether the CFBA acquisition qualified as a pooling.[18]
- IBP's policy of recognizing revenue upon invoicing, which was going to have to change on a going-forward basis because of new SEC guidance.[19]
- IBP's possible over-confidence about the outcome of certain environmental cases.[20]

- IBP's decision to treat its stock option plan as involving the issuance of "fixed" rather than "variable" options, and whether the accounting treatment for the plan, which was disclosed in the company's financial statements, was proper.[21]

### IBP And Tyson Hold A December 8, 2000 Due Diligence Meeting

On December 8, 2000, due diligence teams from Tyson and IBP met in Sioux City, Iowa. The meeting was attended by the top managers from each side. Tyson's team included its CEO John Tyson, its CFO Steve Hankins, its Senior Finance Vice President Dennis Leatherby, and the in-house lawyer who was its due diligence point person, Read Hudson. Tyson was also represented by its outside financial and legal advisors. The IBP team included Peterson, Bond, Shipley, and Hagen, as well as its outside financial and legal advisors.

Tyson came to the meeting expecting the now *de rigeur* Power–Point presentation. IBP came expecting to answer Tyson's questions. As a result, the meeting became a question and answer session that covered IBP's business, segment by segment.

At least two important issues were discussed at the meeting. I will start with the DFG issue. Going into the December 8, 2000 meeting, the chairwoman of the IBP special committee, Joann Smith, specifically told John Tyson to ask about DFG at the meeting.

According to IBP witnesses, the DFG situation had gotten more serious by De-

16. McCaleb Dep. at 145.

17. *Id.* at 139.

18. *Id.* at 45–46; PX 442.

19. McCaleb Dep. at 104–105.

20. PX 561.

21. PX 74.

cember 8. IBP's top management was concerned that the accounting problems at DFG were deeper than they had recognized and that additional charges to earnings might be necessary. The IBP employee-witnesses all remember Peterson saying that the DFG problem had gotten worse by at least $20 million. Peterson himself remembers speaking in angry and vehement terms about Andy Zahn, labeling him as a "thief in the hen house," and the progeny of a female dog who should be hanged on main street in front of a crowd.[22] He also recalls saying that DFG was a "black hole." His colleagues at IBP have far less specific recollections, but do recall Peterson being quite upset.

The Tyson witnesses have a different recollection. They recall being told that DFG was a $9 million problem. Leatherby's notes of the meeting note that there had been a "$9 mm writedown here (guy fired) fudged earnout," that DFG was "not doing well," but that IBP "believe[d] in bus."[23] Hankins's notes about DFG tersely state: "DFG—At bottom of problem."[24] None of the Tyson witnesses heard Peterson describe Zahn—at that meeting—in such unforgettable terms. They do admit, however, that Peterson appeared agitated and upset by the issue, that the problem was attributed to fraud by Zahn, that Zahn had been the head of the business, that Zahn was now gone, and that IBP was looking into his activities.

Tyson CEO John Tyson testified at his deposition that he was told at the December 8, 2000 meeting that the problem had reached $20 million, which accords with the account of the IBP witnesses.[25] At trial, John Tyson recanted this testimony. And a chronology prepared in early 2001

by Leatherby indicates that the DFG problem was defined at $9 million on December 8, 2000, but that he was told by IBP in mid-December, 2000 that the DFG problem was "more like $30 mm."[26]

I cannot conclude with any certainty exactly what was said at the December 8, 2000 meeting. I find it unlikely that Peterson spoke as vividly as he now recalls at that meeting; rather I believe that Peterson is recalling later comments he made to Tyson representatives. But the parties were then engaged in very intensive efforts on several fronts at once. The DFG discussion on December 8, 2000 then had little of the significance that it has now.

It is quite possible that all of the witnesses are testifying honestly, but that some have telescoped separate events together in a manner that generates chronological error. For reasons that will become clear, the question of whether Tyson was informed on December 8 that the problem was worse than $9 million is not critical. The undisputed facts show that Tyson was apprised of fraud by the highest level executive of DFG and that the business had serious problems. Likewise, it is undisputed that the IBP representatives believed that DFG was a viable business, notwithstanding the serious problems it faced because of Zahn, and that they were acting to address those problems so that DFG could be turned around.

### The Discussion Of The Rawhide Projections

The Rawhide Projections were also discussed at the December 8 meeting. IBP management again indicated that the Projections were based on reasonable and at-

---

22. Peterson Dep. at 85; Tr. 1210–11.

23. DX 383, at T53527.

24. DX 306, at T53134.

25. Tyson Dep. at 74.

26. PX 243.

tainable assumptions, and that they had confidence in the company's ability to meet those projections in future years. Again, however, these statements were made in a context that emphasized the inherent uncertainty of any prediction of future performance. Much of the meeting dealt with IBP's business, including the various risk factors that influence whether IBP will perform well. In particular, the Tyson representatives were told about the cattle cycle, and the adverse effect that severe weather conditions have on cattle supplies.[27] IBP's management never promised or guaranteed that the company would meet the Rawhide Projections. In fact, Peterson told Tyson that one of DLJ's biggest concerns during the LBO process was the difficulty of forecasting IBP's future earnings.[28]

The participants seem to have placed little focus on FY 2000. IBP's representatives never clearly indicated that the company would not meet the Rawhide target for the year. For their part, the Tyson participants appear to have been oblivious to the obvious warnings in the IBP third quarter 10–Q that IBP was well behind the run-rate needed to meet the Projections, particularly as to Foodbrands. Therefore, the Tyson and IBP representatives did not get "granular"—as the current lexicon goes—regarding IBP's 2000 performance-to-date. Indeed, at no time in December did Tyson ever ask IBP for updated profit and loss information for the year.

*Tyson Asks For Additional Due Diligence Regarding Foodbrands*

After the December 8, 2000 meeting, Tyson quickly commenced its tender offer. As due diligence continued, Tyson re-quested access to additional accounting information involving Foodbrands. IBP management responded with this basic and consistent theme: "if you want to look at it, we have to show it to Smithfield, too. But if you want Smithfield to see it, you can have it."

This line of reasoning was frustrating to certain members of Tyson's due diligence team. Nonetheless, Tyson was never denied access to documents, it was simply told to make a tactical decision. Because Tyson wanted to buy IBP and wanted to compete with Smithfield after doing so, Tyson did not wish Smithfield to see the information. Nor did IBP management, who preferred that Tyson come out on top in the bidding.

Tyson also never chose to narrow its due diligence requests to deal only with the fraud at DFG. It did so even though its own accountants were concerned about the issue and whether IBP had really gotten to the bottom of the problem.[29] While Tyson says it did not dig deeper because IBP management told it there was nothing bad at Foodbrands and Tyson relied upon those assurances, I do not find that testimony credible. While IBP management may have said that there were no problems at Foodbrands other than DFG, there is no credible evidence that any such statements were untrue when made, or, as we shall see, that Tyson placed any trust in those statements. Most important, IBP never denied Tyson access and had already told Tyson that there had been fraud at DFG. As a result, it is more probable that Tyson simply wanted to keep Smithfield from having knowledge about a business unit Tyson hoped to soon own. What is certain is that Tyson never demanded access to additional due dili-

---

**27.** DX 306, at 53132; DX 383, at T53522.

**28.** Tr. 2059–60; DX 383, at T53529.

**29.** McCaleb Dep. at 45.

gence as a condition to going forward with a merger.

### The Problems At DFG Grow Deeper

During this same period, IBP management was wrestling with the DFG situation. On December 11, 2000, Foodbrands' CFO Brady had sent a memorandum to Foodbrands President Randy Devening. The memorandum signaled that additional write-offs would be necessary, and that DFG would suffer serious losses for the year in proportion to the size of its business. The memorandum concluded by stating:

> [I]t is clear that the business as it is clearly configured is not economically viable. We need to move rapidly and decisively to eliminate costs, improve sales realization and stem losses. DFG's management is in the process of preparing a detailed plan to turn the business around.[30]

Soon thereafter, IBP deepened its examination of DFG by assigning a team from Price Waterhouse Coopers ("PWC") to do a full investigation. Brady's memo was never turned over to Tyson (or to Smithfield) in due diligence. Peterson's trial testimony made clear that he had little regard for Brady's views of the matter, an attitude that is explicable given that Brady had stifled Hughes' earlier efforts to explore the DFG issues more deeply and to apprise IBP's audit committee about his concerns.

According to Tyson, IBP's failure to turn over the Brady memorandum was inconsistent with Hagen's representation to Hudson that she had turned over all

audit reports for the "company" to Tyson. According to Hagen, she interpreted this as requesting all audit reports for IBP (*i.e.*, the "company") itself, not all of its various business units, and responded accordingly.[31] Hudson never asked Hagen for audit reports specific to DFG.

### Shipley Prepares New FY 2000 Numbers For Use In An Auction

By mid to late December, the IBP special committee was preparing to conduct an auction between Tyson and Smithfield. By this point, the Rawhide group was out of the running and happy to receive a termination fee courtesy of the winning bidder.

J.P. Morgan asked Shipley to update his Rawhide Projections for use in this final bidding stage. On December 20, 2000 Shipley provided an update to J.P. Morgan. The update reduced IBP's expected EBIT for FY 2000 by $70 million—from $542 to $472 million.[32]

On December 21, J.P. Morgan sent Tyson and Smithfield bid instructions which called for them to submit best and final bids, along with proposed merger contracts, by 5:00 p.m. on December 29, 2000. The instructions informed the bidders that the special committee was free to change the rules of the process and that no agreement would be binding until reduced to a signed contract.

### Tyson Receives Comment Letters From The SEC And Does Not Share Them With IBP

During this period, Tyson's lawyers at Millbank, Tweed had been in communica-

---

30. DX 30.

31. At trial, Hagen admitted she did not review IBP's internal audit database in compiling her response. Tr. 1569–70. Nonetheless, Tyson has not argued that it did not receive "IBP" audit reports, nor has it produced any specific request by Hudson for Foodbrands or

DFG audit reports after Hagen's assertion that she had sent all company audit reports. In due diligence, as in discovery, recipients of information often review what they receive in order to identify possible gaps.

32. PX 108.

tion with the SEC about its tender offer. The communications addressed, among other things, whether Tyson had to exercise good faith in determining whether a condition to the tender offer closing had failed.

Millbank, Tweed did not send the SEC correspondence to IBP.

### Tyson Raises Its Bid After Learning That IBP's FY 2000 Earnings Would Be Lower Than The Rawhide Projections Had Anticipated

In the middle of the day on December 28, 2000, Tyson received Shipley's updated numbers from J.P. Morgan, which showed a $70 million decrease in FY 2000 IBP earnings. After learning of that reduction, Tyson raised its tender offer bid $1.00 a share to $27.00 per share in cash.

### Tyson Is Informed Of Additional Problems At DFG

On December 29, 2000, IBP and Tyson representatives held two due diligence calls. In the first, Peterson and IBP's controller, Craig Hart, spoke with Tyson CFO Hankins and General Counsel Baledge. Peterson told Hanks and Baledge that the DFG charges to earnings had grown to $30 to $32 million, inclusive of the original $9 million charge and a $3 million charge to a reserve. Because he was not a numbers man, Peterson also told them that his CFO Shipley would go over all the numbers with them later in the morning.

On the second call, Shipley addressed the DFG issue, as well as the larger issue of reconciling his December 20 projection for FY 2000 with the Rawhide Projections. As to DFG, Shipley indicated that their best estimate was that the problem had grown to $30 to $35 million, and that there could be more charges to come.[33] Shipley told Tyson that PWC and IBP were fairly far along in their work, but that they had not yet finished working on the accounting issues at DFG. Shipley indicated that DFG would not be contributing at all to earnings in FY 2000.

Tyson representatives questioned the size of these charges in relation to the size of DFG and the fact that IBP had paid less than $100 million to buy the business. They asked how much goodwill IBP carried on its books for DFG because the amount of the charges seemed very large for a business of DFG's size. Shipley told Tyson that IBP had not yet finished accounting for the problems and that examining the issue of goodwill was necessary to complete that process.[34] He also told Tyson that IBP had not figured out yet how it would account for the DFG issues, and that the problems had arisen from past conduct that took place for over a year.[35]

During the call, Shipley also reconciled his revised FY 2000 estimate with the Rawhide Projections. He informed Tyson that the beef business was off by around $20 million because of tighter margins in the fourth quarter of 2000. This $20 million decrease was offset almost exactly by improved performance in the logistics sectors. As a result, the entirety of the discrepancy related to Foodbrands. Much of that came from the charges from DFG and DFG's failure to reach $10 million in EBIT. The rest came from under-performance in the rest of Foodbrands. Shipley's recitation of IBP's likely FY 2000 performance was reasonable, given the information he knew and the fact that he

33. PX 438; Tr. 2609–10; Tr. 833.

34. Tr. 835–36.

35. Tr. 834–35.

told Tyson that the DFG accounting was not yet concluded.[36]

Shipley also discussed the Rawhide Projections for future years, particularly as to Foodbrands. Shipley indicated that he had not changed them, and that the numbers were attainable. He explained certain strategies IBP expected to implement that would help reach that number. Shipley did not lead Tyson to believe that meeting the Projections would be easy or a sure thing, but that IBP had the capability to do so. As to DFG, Shipley indicated that it would not deliver EBIT of $10 million in FY 2001, but could perhaps make $2 to $5 million.[37]

### Tyson's Lack Of Faith In IBP's Management

By this point, Tyson's representatives harbored more than a healthy skepticism regarding IBP's representations. The evidence reveals, for example, that Tyson had "BIG QUESTIONS" about Foodbrands' ability to meet its projected performance for FY 2001.[38] Hankins scribbled down a note that said "How can $80 m sales company hit you for $30 + million."[39] Tyson's investment banker doubted that DFG had ever made a real profit.[40]

Tyson also placed little faith in Shipley. Hankins did not believe that Shipley had addressed the financial issues between the companies in the manner expected of a public company CFO. Hankins knew that he, rather than Shipley, was likely to be the CFO of the combined companies when all was said and done.

By their own admission, Tyson's representatives had had "red flags" waved at them.[41] They found it "alarming" that there was such a sharp drop-off between IBP's expected FY 2000 performance and the Rawhide Projections, and were angry that the likely shortfall had not been highlighted at the December 8 due diligence meeting.[42]

Tyson CEO John Tyson thought he had been "misled or lied to."[43] By December 29, John Tyson's level of confidence in Shipley was simple, he had "none."[44] He had been told by Bond that Shipley was likely to be replaced as CFO of IBP. John Tyson believed that Foodbrands was "broken."[45] In sum, John Tyson did not trust IBP management going into the final stages of the bidding process.

### Tyson Proceeds To Raise Its Bid In The Face of Waving Red Flags

In keeping with its skepticism about IBP's assurances, Tyson was receiving advice from its investment bankers that allowed it to examine whether an acquisition of IBP would make sense if Foodbrands performed at much lower levels than were projected in the Rawhide Projections. For example, Merrill Lynch ran a down-

---

36. Tyson attempted to show that Shipley had under-stated Foodbrands' performance, by attempting to show that his December 20 estimates were rosier than were the company's own weekly profit and loss statements as of that time. Those statements, however, backed out the CFBA Charges previously discussed, as the record evidence demonstrates. DX 528; DX 529. As a result, Tyson's contention is without merit.

37. Tr. 2605–06.

38. DX 306, at 53162.

39. PX 116, at T23655.

40. Tr. 2592–93.

41. Tr. 2075–78.

42. *Id.*

43. Tyson Dep. at 47; Tr. 2309.

44. Tr. 2309–2310.

45. Tr. 2094–95.

side case in which Foodbrands EBIT would be only $85 million FY 2001 and 2002, and stay at a flat $95 million in FY 2003–2005.[46] Merrill Lynch also ran downside cases for IBP's performance as a whole that used assumptions more pessimistic than the Rawhide Projections.

During the evening of December 29, Smithfield put in an all stock bid it valued at $30 per share. On or about that same date, a member of Tyson management and Ernst & Young discussed the possibility that the DFG problem could require IBP to restate its previously reported financials and to accept an impairment charge.[47]

### Tyson Wins The Auction—Twice

On December 30, 2000, Smithfield advised the special committee that $30 was its best and final offer. Special committee chair Smith called John Tyson and told him that if Tyson bid $28.50 in cash it would have a deal. John Tyson agreed and Smith said they had a deal. Later, the IBP special committee met to consider the Tyson and Smithfield bids. With the advice of J.P. Morgan, the special committee considered Tyson's $28.50 cash and stock bid to exceed the value of Smithfield's all stock $30 bid. The special committee decided to accept Tyson's bid, subject to negotiation of a definitive merger agreement.

As a courtesy, the special committee and its counsel informed Smithfield that it had lost the auction. On December 31, Smithfield increased its all stock bid to $32.00. With deep chagrin, Smith went back to John Tyson and explained what had happened and the committee's duty to consider the higher bid. John Tyson was justifiably angry, but understood the realities of the situation.

Tyson Foods went to the well again and drew out another $1.50 a share, increasing its bid to $30 per share. IBP agreed and this time the price stuck.

### The Merger Agreement Negotiations

While the auction was on, the lawyers for IBP's special committee had been negotiating possible merger agreements with Tyson and Smithfield. By December 30, the IBP lawyers were mostly focused on Tyson because it appeared they had prevailed in the auction.

The document that was used as a template for what became the final Merger Agreement was initially prepared by Millbank Tweed, whose team was led by Lawrence Lederman. Lederman used the Rawhide merger agreement as his starting point because he believed it was a good agreement for a buyer with strong representations and warranties on the part of the seller.

Late on December 30, IBP sent Tyson's negotiators the disclosure schedules to the Merger Agreement, which had been drafted by IBP's General Counsel Hagen. These schedules included a Schedule 5.11 that expressly qualified Section 5.11 of the Merger Agreement, which reads as follows:

> Section 5.11. *No Undisclosed Material Liabilities.* Except as set forth in *Schedule 5.11* the Company 10–K or the Company 10–Qs, there are no liabilities of the Company of any Subsidiary of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than:

---

**46.** Tr. 2096–2098; Tr. 2063.

**47.** McCaleb Dep. at 57–58, 91–96.

(a) liabilities disclosed or provided for in the Balance Sheet;

(b) liabilities incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date or as otherwise specifically contemplated by this Agreement;

(c) liabilities under this agreement;

(d) other liabilities which individually or in the aggregate do not and could not reasonably be expected to have a Material Adverse Effect.

Schedule 5.11 itself states:

*No Undisclosed Material Liabilities*

Except as to those potential liabilities disclosed in Schedule 5.12, 5.13, 5.16 and 5.19, the Injunction against IBP in the Department of Labor Wage and Hour litigation (requiring compliance with the Wage and Hour laws), and *any further liabilities (in addition to IBP's restatement of earnings in its 3rd Quarter 2000) associated with certain improper accounting practices at DFG Foods, a subsidiary of IBP, there are none.*[48]

On a later conference call between Tyson and IBP negotiators, Hagen told the Tyson participants that Schedule 5.11 was intended to cover the DFG issues discussed by Shipley in the December 29 conference call. The Tyson negotiators accepted the Schedule, based on prior discussions between Tyson in-house counsel Hudson and Tyson Finance Vice President Leatherby.

Tyson's lead outside lawyer, Lederman, did not participate in the call in which Schedule 5.11 was accepted. It appears that neither he, Baledge or Hankins learned about the Schedule until well after the Merger Agreement was signed on January 1, 2001.

*The Merger Agreement's Basic Terms And Structure*

The Merger Agreement contemplated that:

- Tyson would amend its existing cash tender offer (the "Cash Offer") to increase the price to $30 per share.

- Tyson would couple the cash tender offer with an "Exchange Offer" in which it would offer $30 of Tyson stock (subject to a collar) for each share of IBP stock. This would permit IBP stockholders who wished to participate in the potential benefits of the Tyson/IBP combination to do so.

- The Cash Offer would close no later than February 28, 2001 unless the closing conditions set forth in Annex I of the Merger Agreement were not satisfied.

- If the conditions to the Cash Offer were not met by February 28, 2001, Tyson would proceed with a "Cash Election Merger" to close on or before May 15, 2001 unless the closing conditions set forth in Annex III of the Merger Agreement were not satisfied. In the cash election merger, IBP stockholders would be able to receive $30 in cash, $30 in Tyson stock (subject to a collar), or a combination of the two.

The Annexes to the Agreement contain certain language that is substantively identical regarding Tyson's duty to close the transactions. That language provides:

*[E]xcept as affected by actions specifically permitted by this Agreement,* the representations and warranties of the Company contained in this Agreement (x) that are qualified by materiality or Material Adverse Effect shall not be true at and as of the scheduled expiration of the Offer as if made at and as of

---

48. Emphasis added.

such time (except in respect of representations and warranties made as of a specified date which shall not be true as of such specified date), and (y) that are not qualified by materiality or Material Adverse Effect shall not be true in all material respects at and as of the scheduled expiration date of the Offer as if made at and as of such time (except in respect of representations and warranties made as of a specific date which shall not be true in all material respects as of such specified date).[49]

The previously described Section 5.11 is one of the representations and warranties referenced above. Primarily implicated in this case are the following representations and warranties:

Section 5.07. *SEC Filings.* (a) The Company has delivered or made available to Parent (i) the Company's annual report on Form 10–K for the year ended December 25, 1999 (the *"Company 10–K"*), (ii) its quarterly report on Form 10–Q for its fiscal quarter ended September 23, 2000, its quarterly report on Form 10–Q for its fiscal quarter ended June 24, 2000 (as amended) and its quarterly report on Form 10–Q for its fiscal quarter ended March 25, 2000 (together, the *"Company 10–Qs"*), (iii) its proxy or information statements relating to meetings of, or actions taken without a meeting by, the stockholders of the Company held since January 1, 1998, and (iv) all of its other reports, statements, schedules and registration statements filed with the SEC since January 1, 1998.

(b) As of its filing date, each such report or statement filed pursuant to the Exchange Act did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances

under which they were made, not misleading.

(c) Each such registration statement, as amended or supplemented, if applicable, filed pursuant to the Securities Act of 1933, as amended (the *"Securities Act"*), as of the date such statement or amendment became effective did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

Section 5.08. *Financial Statements.* The audited consolidated financial statements of the Company included in the Company 10–K and unaudited consolidated financial statements of the Company included in the Company 10–Qs each fairly present, in all material respects, in conformity with generally accepted accounting principles applied on a consistent basis (except as may be indicated in the notes thereto), the consolidated financial position of the Company and its consolidated subsidiaries as of the dates thereof and their consolidated results of operations and changes in financial position for the periods then ended (subject to normal year-end adjustments in the case of any unaudited interim financial statements). For purposes of this Agreement, *"Balance Sheet"* means the consolidated balance sheet of the Company as of December 25, 1999 set forth in the Company 10–K and *"Balance Sheet Date"* means December 25, 1999.

Section 5.09. *Disclosure Documents.* (a) Each document required to be filed by the Company with the SEC in connection with the transactions contemplated by this Agreement (the *"Company Disclosure Documents"*), including,

---

49. Agreement, Annex I(d), Annex III § (14)(e) (emphasis added).

without limitation, (i) the Exchange Schedule 14D–9 (including information required by Rule 14f–1 under the Exchange Act), the Schedule 14D–9/A (including information required by Rule 14f–1 under the Exchange Act) and (iii) the proxy or information statement of the Company containing information required by Regulation 14A under the Exchange Act (the *"Company Proxy Statement"*), if any, to be filed with the SEC in connection with the Offer or the Merger and any amendments or supplements thereto will, when filed, comply as to form in all material respects with the applicable requirements of the Exchange Act except that no representation or warranty is made hereby with respect to any information furnished to the Company by Parent in writing specifically for inclusion in the Company Disclosure Documents.

(b) At the time the Schedule 14D–9/A, the Exchange Schedule 14D–9 and the Company Proxy Statement or any amendment or supplement thereto is first mailed to stockholders of the Company, and, with respect to the Company Proxy Statement only, at the time such stockholders vote on adoption of this Agreement and at the Effective Time, the Schedule 14D–9/A, the Exchange Schedule 14D–9 and the Company Proxy Statement, as supplemented or amended, if applicable, will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. At the time of the filing of any Company Disclosure Document other than the Company Proxy Statement and at the time of any distribution thereof, such Company Disclosure Document will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. The representations and warranties contained in this *Section 5.09(b)* will not apply to statements or omissions included in the Company Disclosure Documents based upon information furnished to the Company in writing by Parent specifically for use therein.

(c) Neither the information with respect to the Company or any Subsidiary that the Company furnishes in writing to Parent specifically for use in the Parent Disclosure Documents (as defined in *Section 6.09(a)*) nor the information incrporated (sic) by reference from documents filed by the Company with the SEC will, at the time of the provision thereof to Parent or at the time of the filing thereof by the Company with the SEC, as the case may be, at the time of the meeting of the Company's stockholders, if any, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

Section 5.10. *Absence of Certain Changes.* Except as set forth in *Schedule 5.10* hereto, the Company 10–K or the Company 10–Qs, since the Balance Sheet Date, the Company and the Subsidiaries have conducted their business in the ordinary course consistent with past practice and there has not been:

(a) any event, occurrence or development of a state of circumstances or facts which has had or reasonably could be expected to have a Material Adverse

Effect . . . . [50]

Sections 5.07–5.09 therefore warrant the material accuracy of IBP's 1999 10–K and its 10–Qs for the first three quarters of 2000 (the "Warranted Financials"). Viewed literally and in isolation, these representations can be read as providing Tyson with a right not to close if IBP had to restate the Warranted Financials on account of the earnings charges at DFG that clearly related to past conduct that occurred during the periods covered by the Warranted Financials. Meanwhile, § 5.10 protected Tyson in the event IBP suffered a Material Adverse Effect, as defined in the Agreement.

The Agreement also required Tyson to correct promptly any information contained in its SEC filings regarding its Cash Tender and Exchange Offers (the "Offer Documents") that had become false and misleading.[51] Tyson was also required to provide IBP promptly with any correspondence between itself and the SEC regarding the Offer Documents.[52] For its part, IBP agreed to correct promptly any information it had given to Tyson for inclusion in the Offer Documents.[53]

*The December 29 SEC Comment Letter*

On December 29, the SEC sent an e-mail to IBP special committee counsel Seth Kaplan at the firm of Wachtell, Lipton. The e-mail contained a fifteen-page letter from the SEC's Division of Corporate Finance to IBP CEO Peterson commenting on the preliminary Rawhide Proxy as well as the Warranted Financials (the "Comment Letter").

At the time Kaplan received this e-mail, he was swamped with numerous pressing tasks. He quickly scanned the document on screen and concluded that it largely related to the by-then moribund Rawhide transaction. Kaplan had been expecting comments on the Rawhide proxy before year's end. And in fact, the letter's initial 42 comments were focused on the Rawhide preliminary proxy. What Kaplan failed to notice is that the latter half of the document contained 45 comments regarding the Warranted Financials, which had been incorporated by reference into the Rawhide proxy. Kaplan also failed to notice that the letter had been e-mailed only to him, and not to Peterson.

Instead, Kaplan simply sent a copy of the Comment Letter on to his associate, Ante Vucic, to handle. He did not send a copy to Tyson, Smithfield, or to IBP.

The Comment Letter addressed a number of items that Tyson had already identified in its due diligence process. For example, the Comment Letter:

- Asked IBP to identify how it had discovered the $9 million inventory problem at DFG and a synopsis of the events that caused the problem.
- Asked IBP to disclose its revenue recognition policies to comply with recent SEC accounting guidelines.
- Requested information regarding pooling of interest accounting for the CFBA acquisition;
- Asked IBP to revisit its reporting of its business segments, in view of certain inconsistencies in its prior approach.[54]

In January, Kaplan learned that the SEC had not faxed a copy of the Comment Letter to Peterson. Instead, the SEC

---

**50.** Agreement §§ 5.07–5.10.

**51.** *Id.* § 2.01(e), (h).

**52.** *Id.*

**53.** *Id.*

**54.** PX 122.

staffers responsible for the Comment Letter had mailed Peterson's copy sometime after the New Year's holiday, most likely January 3, 2001. The Comment Letter arrived by mail at IBP on January 8, 2001, and IBP sent it to Tyson by facsimile on January 10, 2001.

IBP's General Counsel Hagen spoke with the SEC about why IBP had not received an earlier copy. She was led to believe that the SEC had received instructions from Wachtell, Lipton to fax to it and mail to IBP. Hagen blew her top. During the auction process, Hagen had found it difficult to be on the sidelines while the Wachtell, Lipton firm acted in the lead role. While Hagen understood that the Rawhide LBO made this the wiser course, tensions had arisen between her and Kaplan.

She unleashed her anger at Kaplan in a series of e-mails. Kaplan denied that he had instructed the SEC to fax to him and mail to IBP. I believe him. After she cooled off, so did Hagen.

In a letter to the IBP special committee, Tyson's General Counsel Baledge also expressed his concern about receiving the letter twelve days after its mailing date. He pointed out that IBP had received this letter during the final negotiation and bidding round. He claimed that the SEC's comments should have been disclosed and that "no exception was taken to IBP's representations relating to the issues raised in the SEC comment letter." [55]

Baledge also claimed that the Comment Letter would cause Tyson delay in commencing its Exchange Offer, which it had been prepared to launch that very day. Because the Exchange Offer Documents incorporated IBP's financial statements,

Tyson had to hold off until PWC resolved the issues the SEC raised. Baledge also complained that progress could have been made on the issues, had Tyson received the letter earlier.

Baledge closed by indicating that Tyson was "assessing the materiality and impact of the SEC's comments and the SEC's requirement that IBP revise its financial statements." [56]

### Tyson's Board and Shareholders Vote For The Merger Agreement

On January 12, 2001, Tyson's board of directors met and ratified management's decision to enter into the Merger Agreement. Peterson and Bond attended as guests of Tyson. At that point, Tyson expected to invite both of them onto to its board, and for Bond to run the IBP unit of the combined entity.

At the board meeting, Baledge did not discuss the Comment Letter with the Tyson board.

The same day the Tyson shareholders meeting was held. The Merger Agreement was put to a vote of the Tyson stockholders. Baledge made the motion. He did not inform the shareholders of the Comment Letter. The Tyson stockholders approved the Merger Agreement and authorized management to consummate the transactions it contemplated.[57]

The fact that the Tyson board and stockholders were not told about the Comment Letter is made more understandable by the fact that Tyson's accountants believed that the Comment Letter did not contain "any comment that [Ernst & Young] thought was significant to Tyson as an

**55.** PX 177.

**56.** *Id.*

**57.** PX 189.

acquiror that Ernst & Young had missed prior to January 1, 2001." [58]

### John Tyson Trumpets The Deal's Benefits

During January, Tyson and its CEO John Tyson told the world how wonderful the Tyson/IBP combination was going to be. "By combining the number one poultry company with the leader in beef and pork we are creating a unique company...." [59] John Tyson emphasized that Tyson had seized a unique "'point in time'" opportunity to put together two companies who were industry leaders and thus become the world's "premier protein provider." [60] Together, the companies would dominate the meat cases of America's supermarkets.

John Tyson's public statements also acknowledged that there were no sure things in life. Thus, he indicated that Tyson was purchasing IBP *fully aware of the cyclical factors that affect commodity meat products.* [61] John Tyson also evinced his acknowledgement that IBP was not as far along in the processed foods side of their business as Tyson Foods was and that Tyson Foods' expertise would help IBP achieve success in this area:

> When you look at IBP, they look like Tyson Foods twenty years ago. They have put in place the foundation, the assets, but most of all, the people to do to the beef and pork industry what our great company has done in the last fifteen or twenty years to the poultry industry. When you see that, you understand why we get excited.
>
> In our experiences [sic] in branding case ready packaging and fully cooked value-

added products mirrors the path that they have created for themselves. It is our belief that our experience and market access in both foodservice and retail can help them achieve their goals quicker and more efficiently. [62]

None of Tyson's public statements or internal documents specifically reference DFG as important to the fulfillment of John Tyson's vision for the combined companies.

### IBP Addresses Its Issues With The SEC While Tyson Positions Itself To Negotiate A Lower Price

On January 16, 2001, Shipley informed Hankins that the DFG earnings charges might reach $50 million, including the $9 million already taken. Shipley indicated that some of the charges related to 1999, and that it was unclear if a restatement to 1999 earnings would be necessary. He also told Hankins that the impairment study was underway but not complete. Hankins concluded "without a doubt" from what he was told that IBP would have to restate the Warranted Financials. [63]

The next day Tyson extended its Cash Offer. The only reason it gave was that the waiting period under the Hart–Scott–Rodino anti-trust law had not expired. On January 19, 2001, IBP met with Tyson's financial and accounting team and discussed the DFG issues in more depth. No one at Tyson told IBP that IBP would breach the Merger Agreement if it restated the Warranted Financials.

On January 24, 2001, Baledge wrote the IBP special committee and told it that Tyson would issue a press release the fol-

**58.** McCaleb Dep. at 166, 187.

**59.** PX 156.

**60.** PX 178.

**61.** PX 156.

**62.** *Id.*

**63.** Tr. 1961.

lowing day extending its Cash Offer again. His letter again reiterated his view that Tyson should have received the Comment Letter before the Merger Agreement was signed. Baledge said that Tyson would publicly indicate that the reason for extending the Cash Offer would be that the Cash Offer Documents contained information prepared in reliance on the Warranted Financials. As a result, Tyson viewed it as prudent to delay closing until IBP satisfied the SEC. For the same reason, Tyson was not going to commence its Exchange Offer until the SEC issues were settled. Once that was done, Tyson would "assess the impact and materiality of any changes to your financial statements and business." [64]

In reaction to Tyson's January 25 disclosure, IBP issued a letter from Peterson to Tyson. The letter disclosed that the DFG charges to earnings would be $47 million, inclusive of the $9 million, and that the charge related to prior periods. It said that IBP was still considering whether a restatement was necessary and the extent of any asset impairment at DFG. Peterson's letter also stated that IBP had sent a letter to the SEC that day with IBP's response to the Comment Letter and that IBP was scheduled to meet with the SEC on January 29, 2001 to discuss its concerns.

At the January 29, 2001 meeting, IBP hoped to get some helpful guidance from the SEC regarding how it should account for the DFG issue.[65] This expectation was disabused at the meeting. Instead, the SEC told IBP that it had to figure out how to account for DFG and that it should do so promptly. Members of the SEC's Division of Enforcement also attended the meeting, to the surprise and chagrin of IBP.

On February 5, 2001, IBP delivered to the SEC a large submission of materials to address issues raised by the SEC. In those materials, IBP stated that the DFG adjustments were "material to previously reported quarterly 2000 data as well as to 1999." [66] Hagen promptly sent this submission to Baledge. Baledge never informed her that if IBP restated the Warranted Financials, it would automatically breach the Merger Agreement. The next day, Tyson issued a press release extending the Cash Offer yet again for the same reasons expressed in its January 25, 2001 extension.

On February 7, 2001, the SEC wrote to IBP and indicated that it would "not decline to accelerate the effectiveness of a registration statement" for the Exchange Offer so long as IBP had fully and fairly restated the Warranted Financials to address the DFG issue and the registration statement adequately described the restatements.[67] Hagen discussed this letter with Baledge.

---

64. PX 208. These words were massaged by Baledge at the request of Bond. The original language indicated that Tyson would assess the materiality of any of these questions to the "transaction." Tr. 327.

65. Tyson's expert says that IBP was naïve to think that the SEC would give such counsel, and that IBP was in general less than adroit in its dealings with the SEC. This strategic issue does not bear on the outcome of the case. Tyson's SEC expert essentially believed that IBP should have simply agreed to all of the SEC's concerns straight-away and filed a large restatement. While this would have, of course, shortened the process, under Tyson's theory IBP would still have been in breach. In addition, I note that the SEC itself purports to encourage registrants to discuss difficult issues like IBP faced with it. SEC Staff Accounting Bulletin: No. 99—Materiality, 17 CFR Part 211 [Release No. SAB 99] (Aug. 12, 1999).

66. DX 330, at T4414.

67. PX 237.

By mid-February, the SEC's correspondence with IBP took on a quite brusque and directive tone. The SEC's message was that IBP ought to get on with the business of filing restated financial statements.[68] The SEC had identified several technical issues in the Warranted Financials that were not reported in accordance with the SEC's view of GAAP. In view of the serious DFG issues, the SEC wanted all the issues addressed in very prompt restatements to the Warranted Financials.

During this period, Hagen and Baledge talked about the need for a restatement. Baledge expressed Tyson's preference that there be only one restatement rather than a series of them. He did not tell Hagen that a restatement by IBP would breach the Merger Agreement.[69] Baledge did not do so because he believed that Tyson would have to determine whether any restatement was material to Tyson.[70]

On February 22, 2001, IBP publicly announced that it would have to restate the Warranted Financials to take an additional DFG charge of $32.9 million. DFG took an additional $12 million DFG charge for the fourth quarter of FY 2000. IBP also indicated that it would be taking an impairment charge at DFG of up to $108 million. And the company announced that it would be restating the Warranted Financials to account for the company's stock option plan as a "variable" rather than a "fixed" plan. This issue had arisen during the back-and-forth between the SEC and IBP in 2001, and was not mentioned in the December 29 Comment Letter. Tyson had flagged this issue much earlier in due diligence, and IBP's previous accounting

decision was openly stated in its 1999 10-K.

As the February 28 deadline for the Cash Offer loomed, Hagen approached Tyson about extending the deadline. Tyson never responded. On February 28, Tyson instead terminated the Cash Offer. John Tyson was quoting as stating: "Unfortunately, it will be impossible to complete the cash tender offer by the 28th. IBP continues to work with the SEC to resolve their accounting issues. After that work is complete, we will determine what effect these matters will have on our deal."[71] As of that date, Tyson had not made a determination that IBP had breached a contractual warranty, as Baledge admitted at trial.[72]

IBP responded publicly to the termination of the Cash Offer by indicating that Tyson's decision was in "complete accordance" with the Merger Agreement.[73] Throughout this period, it had continued to note to the public the risk that IBP would not resolve the SEC issues to Tyson's satisfaction.

### Tyson Gets Nervous And Wants To Reprice The Deal

During February, Tyson Foods became increasingly nervous about the IBP deal and began to stall for time. While Tyson still believed that the deal made strategic sense, it was keen on finding a way to consummate the deal at a lower price. The negotiations with the SEC were a pressure point that Tyson could use for that purpose and it did.

Tyson's anxiety was heightened by problems it and IBP were experiencing in the first part of 2001. A severe winter had

68. DX 164; DX 173.
69. Tr. 2496–97.
70. *Id.*
71. PX 277.
72. Tr. 2485–86.
73. PX 274.

hurt both beef and chicken supplies, with chickens suffering more than cows.

Tyson's first quarter 2001 ended on December 30, 2000. During that period, Tyson earned $.12 a share, down from $.25 during the same period in its FY 2000. Tyson's second quarter 2001 was shaping up even worse. Tyson's performance was way down from previous levels. Eventually, Tyson would have to reduce its earnings estimate for this period, only to find out its reduction was not sufficient. Eventually, Tyson reported a loss of $6 million for the pertinent quarter, compared to a profit of $35.7 million for the prior year's period.[74] It described the period as involving the "most difficult operating environment" Tyson had seen since 1981, and admitted that Tyson had suffered from the "on-going effect of the severe winter weather." [75]

Meanwhile, IBP was experiencing similar problems. At the end of January, IBP had begun sending weekly profit & loss ("P & L") statements to Tyson. These showed very slow results that appeared to leave IBP in a compromised position from which to meet the Rawhide Projection of $446 million in EBIT for 2001. Both the beef fresh meats and Foodbrands businesses were performing at below-par levels. When the quarter ended on March 31, 2001, IBP had earned only $.19 a share, meaning that it would have to produce $1.74 a share in earnings over the succeeding three quarters to meet the Rawhide Projection of $1.93 per share for FY 2001.

By mid-February, these factors led the Tyson and IBP factions to approach each other warily. IBP sensed that Tyson wanted to renegotiate. Hagen prepared for an even worse possibility: that Tyson would walk away and IBP would have to enforce the deal. Bond tried to deal with the problem by being responsive to John Tyson's calls for help in reassuring his father, Don Tyson, that the deal still made sense.

On the Tyson side, its key managers began to slow down the merger implementation process to buy time for John and Don Tyson. While Tyson and IBP continued to do all the merger integration planning that precedes a large combination, Tyson was also bent on using its leverage to extract concessions from IBP. To the extent that Tyson Foods had wiggle room not to close the Cash Offer, Don and John Tyson wanted to use that to give them more time to see numbers from IBP and to assess the transaction in light of Tyson's own strategic situation. Their subordinates did as instructed and stalled for time by not agreeing to extend the Cash Offer deadline, as IBP had offered.

By February, Don Tyson had brought in Leland Tollet and Buddy Wray to counsel with him on the transaction. Tollet and Wray were Don Tyson's key executives when he was Tyson's CEO and the three were known as the "old guard." Since Don Tyson controlled 90% of Tyson's stock, his word was still the key one at Tyson, and he was worried.

On March 5, 2001, Dick Bond met with Don Tyson to help alleviate some of those worries. Don Tyson was quite concerned that IBP was not on course to meet its projected earnings for the year. Bond tried to convince him otherwise. As to DFG, Don Tyson said that if he were running IBP, he would "blow that whole thing up and write the whole thing off and move on." [76] Don Tyson never mentioned

**74.** PX 370.

**75.** PX 326.

**76.** Tr. 109–115.

the SEC Comment Letter issues during the entire meeting.

During a later phone conversation, Bond again talked with Don Tyson. Don Tyson raised fears about mad cow disease and hoof-and-mouth disease. Bond addressed these issues and Don Tyson's continued concern about IBP's year-to-date performance. Don Tyson did not voice concerns about DFG or the SEC accounting matters. At the end of the conversation, Don Tyson said he was satisfied and was going fishing. Bond relayed this to John Tyson, who was pleased.[77]

On March 7, 2001, John Tyson sent all the Tyson employees a memorandum stating that Tyson Foods was still committed to the transaction. But on March 13, 2001, he expressed concern to Bond about IBP's first quarter performance and wanted Bond's best estimates for the rest of the year. Bond sent him estimates that had a low estimate of $1.80 per share in earnings and a high side of $2.47, with a best estimate of $2.12. John Tyson's advisor Hankins believed these estimates to be much too optimistic in view of IBP's slow start.

### IBP Filed Its Restated Financials And Tyson Continues Its Strategy To Put Pressure On IBP To Renegotiate

On March 13, 2001, IBP also formally filed its restatements to the Warranted Financials. The formal restatements were in line with the previous release regarding DFG, as was the $60.4 million DFG "Impairment Charge" took in its year 2000 10–K. None of the other issues covered had any impact on IBP's prospects. Tyson reacted in print in a March 14 press release that indicated that Tyson was pleased IBP had resolved most of its issues with the SEC. The press release also indicated that Tyson was continuing to look at IBP's business and noted its weak first quarter results. Behind the scenes, Tyson's investor relations officer, Louis Gottsponer, was turning up the heat on IBP through comments to analysts.

In an internal e-mail, Gottsponer explained Tyson's renegotiation strategy:

> To document this point in the process. We've billed this as the next significant event (we're waiting until they file), so now people want to know what the new timeline looks like....

> To keep the pressure on their stock price. Based on the voice mails that have been left for me (those seven) the street views these restatements as insignificant. *We know these accounting issues aren't the biggest reason to renegotiate* (i.e. beef margins). Lets remind people of that (softly). To set the stage for other points that may help us to renegotiate.[78]

Sure enough, the next day analysts began reporting that IBP's earnings outlook would possibly lead to a renegotiation of the deal.[79]

On March 15, 2001, Tyson in-house counsel Read Hudson sent a letter to Hagen at Baledge's instruction. The letter reads:

> Congratulations on getting your restated SEC filings behind you. I know they involved a lot of hard work on your part.

> Now that all you have left to file is the 2000 10–K, it seems that we should begin preparation of documentation, fil-

---

77. Tr. 122–25.

78. PX 297. Another March 13, 2001 document that evidences Tyson's desire to retrade the deal is PX 310.

79. PX 573.

ings, etc. as we move forward with the cash election merger.... [80]

### Tyson Terminates And Sues IBP

By late March, Don Tyson did not support an acquisition of IBP at $30 per share. On March 26, 2001, Tyson and IBP's merger integration teams had a scheduled meeting. John Tyson used that occasion to raise the possibility of repricing the deal with Bond to $27 to $28 per share. Bond told John Tyson that he did not see how the DFG issue could warrant a reduction of more than $.50 or so. Although he did not tell this to John Tyson, Bond had already come to the pragmatic conclusion that IBP might have to reprice to $28.50 or so in order to get a deal done without a fight. The price discussion went no further.

At the merger integration meeting, the companies' consultant McKinsey & Co. reported that $250 million in synergies could be achieved in the Merger. John Tyson instructed the merger integration team to move full speed ahead.[81] During the meeting, John Tyson had been called out a couple of times. When the meeting concluded, he pulled Bond aside and told Bond that his father, Don Tyson, was coming back to Arkansas. Don Tyson was still nervous about the deal and John Tyson needed Peterson and Bond to help "get him back in the boat." [82]

On March 27, 2001, Merrill Lynch presented Tyson with a revised IBP valuation analysis, using pessimistic assumptions generated by Tyson CFO Hankins. The analysis concluded that $30.00 per share was still within the " 'fairness' range," that

the "transaction still makes tremendous strategic sense," and that "[e]ven at $30 per share, tremendous long-term value accrues to TSN." [83] But the document also contained analyses that Tyson could use to renegotiate a lower price.

On March 28, 2001, Don Tyson called a meeting of the "old guard" and Tyson's current top management. The agenda's first two items were the state of the economy in general, and the state of Tyson's business. As of that day, Tyson's own performance for the year was very disappointing and it had been forced to admit so publicly only days earlier. Only after discussing the first two items on the agenda did the participants discuss the IBP deal. Don Tyson expressed continued concerns about IBP's current year performance and about mad cow disease. When it came time to make the decision how to proceed, Don Tyson left to caucus with the old guard. The new guard was excluded, including John Tyson. Don Tyson returned to the meeting and announced that Tyson should find a way to withdraw. The problems at DFG apparently played no part in his decision, nor did the comments from the SEC.[84] Indeed, DFG was so unimportant that neither John nor Don Tyson knew about Schedule 5.11 of the Agreement until this litigation was underway.[85]

After the old guard had decided that the Merger should not proceed, Tyson's legal team swung into action. Late on March 29, 2001, Baledge sent a letter stating:

Tyson Foods ... will issue a press release today announcing discontinuation of the transactions contemplated by the Agreement and Plan of Merger dated as of January 1, 2001 among IBP, inc.

80. PX 317.

81. Tr. 164–66.

82. Tr. 166–67.

83. PX 347.

84. D. Tyson Dep. at 100–02, 180–82.

85. Tr. 2280–2282; D. Tyson Dep. at 100–102.

("IBP") and Tyson (the "Merger Agreement"). We intend to include this letter with our press release.

On December 29, 2000, the Friday before final competitive negotiations resulting in the Merger Agreement, your counsel received comments from the Securities and Exchange Commission ("SEC") raising important issues concerning IBP's financial statements and reports filed with the SEC. As you know, we learned of the undisclosed SEC comments on January 10, 2001. Ultimately, IBP restated its financials and filings to address the SEC's issues and correct earlier misstatements. Unfortunately, we relied on that misleading information in determining to enter into the Merger Agreement. In addition, the delays and restatements resulting from these matters have created numerous breaches by IBP of representations, warranties, covenants and agreements contained in the Merger Agreement which cannot be cured.

Consequently, whether intended or not, we believe Tyson Foods, Inc. was inappropriately induced to enter into the Merger Agreement. Further, we believe IBP cannot perform under the Merger Agreement. Under these facts, Tyson has a right to rescind or terminate the Merger Agreement and to receive compensation from IBP. We have commenced legal action in Arkansas seeking such relief. We hope to resolve these matters outside litigation in an expeditious and business-like manner. However, our duties dictate that we preserve Tyson's rights and protect the interests of our shareholders.

If our belief is proven wrong and the Merger Agreement is not rescinded, this letter will serve as Tyson's notice, pursuant to sections 11.01(f) and 12.01 of the Merger Agreement, of termination.[86] Notably, the letter does not indicate that IBP had suffered a Material Adverse Effect as a result of its first-quarter performance.

But as indicated in the letter, Tyson had sued IBP in Arkansas that evening, shortly before the close of the business day. The next day IBP filed this suit to enforce the Merger Agreement.

## II. *The Basic Contentions Of The Parties*

The parties have each made numerous arguments that bear on the central question of whether Tyson properly terminated the Merger Agreement, which is understandable in view of the high stakes. The plethora of theories and nuanced arguments is somewhat daunting and difficult to summarize. But the fundamental contentions are as follows.

IBP argues that Tyson had no valid reason to terminate the contract on March 29, 2001 and that the Merger Agreement should be specifically enforced. In support of that position, IBP argues that it has not breached any of the contractual representations and warranties. In addition, IBP contends that Tyson improperly terminated the Cash Offer on February 28, 2001 because all closing conditions were met as of that date. In this regard, IBP says that Tyson did not need IBP to formally file its Restated Financials in order for Tyson to proceed with the Cash Offer. As a result, IBP says that § 2.01(e) and (h) of the Agreement do not provide Tyson with a contractual safe harbor.

Tyson argues that its decision to terminate was proper for several reasons. First, Tyson contends that IBP breached its contractual representations regarding

86. Hudson Dep. Ex. 5.

the Warranted Financials, as evidenced by the Restatements. Second, Tyson contends that the DFG Impairment Charge as well as IBP's disappointing first quarter 2001 performance are evidence of a Material Adverse Effect, which gave Tyson the right to terminate.

Finally, Tyson argues that the Merger Agreement should be rescinded because that Agreement (and related contracts) were fraudulently induced. In this respect, Tyson contends that IBP's failure to disclose the Comment Letter and certain DFG-related documents before January 1, 2001 constitutes ground for rescission. Tyson says that the Agreement should also be rescinded because IBP management made oral statements regarding the Rawhide Projections that they knew to be false, on which Tyson reasonably relied to its detriment. For identical reasons, Tyson says that a letter agreement it signed in connection with the Merger Agreement should also be rescinded, thus entitling Tyson to a refund of a $66 million termination fee it paid to the Rawhide group on behalf of IBP.

The parties have chosen to accompany their basic contentions with a variety of subsidiary theories, all of which derive from the same factual issues.

Before turning to the resolution of the parties' various arguments, it is necessary to pause to discuss certain choice of law issues. The parties are in accord that New York law governs the substantive aspects of the contractual and misrepresentation claims before the court. This accord is in keeping with the parties' choice to have New York contract law govern the interpretation of the Merger Agreement.[87] But they part company on certain issues with respect to the precise burden of proof governing these claims.[88] For the sake of clarity, I will outline the approach I take up front.

■ Under either New York or Delaware law, IBP bears the burden of persuasion to justify its entitlement to specific performance. Under New York law, IBP must show that: (1) the Merger Agreement is a valid contract between the parties; (2) IBP has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) Tyson is able to perform its obligations; and (4) IBP has no adequate remedy at law.[89] These elements must be proved by a preponderance of the evidence under New York law. Delaware law, by contrast, requires that a plaintiff demonstrate its entitlement to specific performance by clear and convincing evidence. The reasons for this are not entirely clear, but seem to rest in the policy concern that a compulsory remedy is not typical and should not be lightly issued, especially given the availability of the more usual legal remedy of money damages.[90]

---

**87.** I have not quibbled with this rare area of agreement, although I note that the Confidentiality Agreement and the agreement giving rise to Tyson's payment of the Rawhide termination fee are governed by the contract law of Delaware.

**88.** It is fair to say that this is one of the more tersely argued disputes in the briefs.

**89.** *Niagara Mohawk Power Corp. v. Graver Tank & Manufacturing Co.*, 470 F.Supp. 1308, 1324 (N.D.N.Y.1979).

**90.** *In re Estate of Getchell*, Del.Ch., C.A. No. 101037, 1994 WL 469153, *4 n. 3, Jacobs, V.C. (Aug. 4, 1994) ("'[c]ourts have, in certain cases, required a party seeking an order of specific performance to meet a higher evidentiary burden, 'for fear of doing greater wrong than by leaving the parties to their legal remedy'") (*quoting* 71 Am.Jur.2d *Spec. Perf.* § 208, at 266 (1973)).

■ Although the conflict of law principles by no means provide clear guidance, the better reading of them suggests that New York law should apply. The relevant principles indicate that the law of Delaware should be applied "unless the primary purpose of the relevant rule of the otherwise applicable law is to affect decision of the issue rather than to regulate the conduct of the trial. In that event, the rule of the state of the otherwise applicable law will be applied." [91] IBP has the better of the argument, in my view. The question of *which* party has the burden of proof may be seen as purely procedural. But the question of *what* the burden of proof is typically constitutes a policy judgment designed to affect the outcome of the court's decision on the merits.[92] For example, Delaware's choice of the clear and convincing evidence standard appears to have been made for substantive policy reasons that do not affect the trial process. The parties have not provided me with authority suggesting why New York selected the preponderance standard, which is not the prevalent rule in the United States for specific performance.[93] Because the New York approach is a minority approach, I infer that New York public policy as expressed by its common law of longstanding is in favor of a standard that makes it easier, rather than more difficult, to hold a party to its specific promise.

For that reason, I conclude that it is most appropriate to apply the law of New York to IBP's claim for specific performance, especially because the application of New York law is in keeping with the parties' own choice of the law governing the Merger.

In this case, IBP's and Tyson's respective abilities to perform the Merger Agreement are not disputed. Nor is there any doubt that the Merger Agreement, on its face, is a binding contract setting forth specific rights and duties. What is most at issue is whether Tyson had a right to terminate what appears to be a valid and binding contract, or to rescind that contract because of misrepresentations or material omissions of fact in the negotiating process.

■ Under both New York and Delaware law, a defendant seeking to avoid performance of a contract because of the plaintiff's breach of warranty must assert that breach as an affirmative defense.[94] Indeed, Tyson has plead breach of warranty as an affirmative claim, and not simply as a defense. Therefore, Tyson bears the burden to show that a breach of warranty excused its non-performance.

■ Under either Delaware or New York law, Tyson also bears the burden to prove its rescission claim. The parties

91. Restatement (Second) of Conflicts § 133 (1971).

92. *Id.; see also id.* § 135.

93. 71 Am.Jur.2d *Spec. Perf.* § 208 (1973) (the "established rule" is that more than a "mere preponderance" is necessary to support an award of specific performance).

94. 96 N.Y. Jur.2d *Spec. Perf.* § 70 ("[T]he defendant must establish by proper proof any defense he interposes in an action for specific performance...."); 84 N.Y. Jur.2d *Pleading* § 153 (1990) (breach of warranty is an affirmative defense); *Brignoli v. Balch, Hardy, &* *Scheinman, Inc.,* 178 A.D.2d 290, 577 N.Y.S.2d 375, 375–76 (1991) ("The defendant bears the burden of proof on an affirmative defense."); *Continental Coach Crafters Co. v. Fitzwater,* Del.Super., 415 A.2d 785, 787 (1980) (treating breach of warranty as an affirmative defense); *see also Dickson–Witmer v. Union Bankers Ins. Co.,* Del.Super., C.A. No. 92C–07–107, 1994 WL 164554, at *5, Barron, J. (Apr. 27, 1994) (party seeking to avoid contractual obligation on grounds of misrepresentation bore burden to prove its affirmative defense).

agree that New York law generally governs these claims, but dispute what state's law governs the precise burden of proof. Under New York law, the plaintiff must prove fraud by clear and convincing evidence.[95] Under Delaware law, by contrast, the standard is a preponderance.[96] Tyson claims that the issue of burden of proof is a purely procedural issue that ought to be decided by the law of Delaware. IBP contends that the issue is a matter of substantive policy that ought to be governed by the law of the state whose law is relevant to the determination of Tyson's claim, the law of New York. For the same reasons discussed above, New York's choice of the clear and convincing standard is best viewed as a policy decision that affects the court's decision, rather than a matter of trial procedure.[97] Given the parties' choice to use New York law as the law governing the Merger Agreement, it makes sense that the merits of any claim for rescission of that contract be decided using the evidentiary burden established by New York law.

Candor requires acknowledgement of the fact that the parties did not provide me with detailed briefing about the choice of law and burden issues discussed above.

These questions may be thought to raise many subtle concerns that I do not pretend to have addressed in any sophisticated way.[98] As a result, I will indicate clearly whether there is any issue in the case that would be decided differently were the evidentiary burden different than I have just outlined.

### III. Resolution Of The Parties' Merits Arguments

In the pages that follow, I first address whether IBP breached a representation and warranty that justified Tyson's termination of the Merger Agreement. I then analyze the merits of Tyson's rescission claims. I conclude with the question of whether Tyson was entitled to terminate its Cash Offer on February 28, 2001.

### A. General Principles Of New York Contract Law

▬▬▬ The Merger Agreement's terms are to be interpreted under New York law. Like Delaware, New York follows traditional contract law principles that give great weight to the parties' objective manifestations of their intent in the written language of their agreement.[99] If

---

**95.** *Gaidon v. Guardian Life Ins. Co.*, 94 N.Y.2d 330, 704 N.Y.S.2d 177, 725 N.E.2d 598, 607 (1999).

**96.** *NRG Barriers, Inc. v. Jelin*, Del.Ch., C.A. No. 15013–NC, 1996 WL 451319, *7, 1996 Del.Ch. LEXIS 99, at *20, Steele, V.C. (Aug. 6, 1996).

**97.** Restatement (Second) of Conflicts §§ 133, 135.

**98.** For example, Tyson asserts that Delaware law requires a party seeking specific performance to demonstrate its entitlement by clear and convincing evidence. It does not dilate on whether that burden applies to the court's determination that the party resisting specific performance is in breach of a written contract, or whether that burden applies solely to the question of whether the court is sufficient-

ly persuaded that an award of specific performance is warranted. Given that one can recover contractual damages simply by proving a contractual breach by a preponderance, it is somewhat inefficient to have the breach determination be governed by a different evidentiary burden solely because the plaintiff seeks specific performance. But that higher merits burden may be thought important to advance the public policy of Delaware. It is because these level-of-proof issues are so bound up with public policy concerns—rather than trial procedure—that I believe that New York law is applicable.

**99.** *USA Cable v. World Wrestling Federation Entertainment, Inc.*, Del.Supr., 766 A.2d 462, 473 (2000) (*citing Brown Bros. Electrical Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 393 N.Y.S.2d 350, 361 N.E.2d 999, 1001

a contract's meaning is plain and unambiguous, it will be given effect.[100] Parol evidence may not be used to create a contractual ambiguity; rather, such ambiguity must be discerned by the court from its consideration of the contract as an entire text.[101]

 In reading a contract, "the [court's] aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations."[102] "In a written document [a] word obtains its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document, all based upon the situation and circumstances existing at its creation."[103] "Particular words should be considered ... in the light of the obligation as a whole" and "not as if isolated from the context."[104]

 When, however, the contract is susceptible to more than one reasonable interpretation, the court may consider extrinsic evidence to resolve the ambiguity.[105] The court's examination of the parol evidence is merely a continuation of an effort to discern the parties' intentions. Therefore, the subjective beliefs of the parties about the meaning of the contractual language are generally irrelevant.[106] Where one of the parties, however, expresses its beliefs to the other side during the negotiation process or in the course of dealing after consummation, such expressions may be probative of the meaning that the parties attached to the contractual language in dispute.[107]

## B. Do The DFG Charges To Earnings Evidence A Breach Of Warranty?

### 1. The Merger Agreement Does Not Unambiguously Assign The DFG–Related Risks

The first question I address is whether the DFG-related problems of IBP were a risk that was contractually accepted by Tyson, through the inclusion of Schedule 5.11. The parties have starkly different views of whether the reference to DFG in Schedule 5.11 operates to qualify all of the representations and warranties in the Agreement. Tyson contends that Schedule 5.11 has no effect on any representa-

(1977); *Kenyon v. Delman,* 38 F.Supp.2d 107, 110 (N.D.N.Y.1998); 22 N.Y. Jur.2d *Contracts* § 30 (1996)).

100. 22 N.Y. Jur.2d *Contracts* § 214 (1996).

101. *First Development Corp. v. Delco Plainview Realty Associates,* 194 A.D.2d 711, 600 N.Y.S.2d 105, 106 (1993).

102. *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 450 N.Y.S.2d 460, 435 N.E.2d 1075, 1078 (1982).

103. *Eighth Ave. Coach Corp. v. City of New York,* 286 N.Y. 84, 35 N.E.2d 907, 909 (1941).

104. *S & S Media, Inc. v. Vango Media, Inc.,* 84 A.D.2d 356, 446 N.Y.S.2d 52, 54 (1982).

105. *Klein v. Empire Blue Cross & Blue Shield,* 173 A.D.2d 1006, 569 N.Y.S.2d 838, 842 (1991).

106. *World Wrestling,* 766 A.2d at 473 (*citing Mencher v. Weiss,* 306 N.Y. 1, 114 N.E.2d 177, 181–82 (1953)).

107. *See, e.g., Alland v. Consumers Credit Corp.,* 476 F.2d 951, 956 (2d Cir.1973) (subjective understanding expressed during negotiations may be probative of meaning that the parties placed on language); Restatement (Second) of Contracts § 201(2) (1979) (same); *Federal Insur. Co. v. Americas Insurance Co.,* 258 A.D.2d 39, 691 N.Y.S.2d 508, 512 (1999) (course of performance is persuasive evidence of intent); Restatement (Second) of Contracts § 202 cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").

tion and warranty other than that contained in § 5.11 of the Agreement. There are no Schedules 5.07–5.09 attached to the Agreement that operate to qualify §§ 5.07–5.09 explicitly. And §§ 5.07, 5.08, and 5.09 are, by their own terms, unqualified by reference to Schedule 5.11, and generally stand for the proposition that IBP warranted that the Warranted Financial Statements were accurate in all material respects and comported with GAAP. Tyson thus claims that these "flat" representations were plainly breached when IBP restated the Warranted Financial Statements to record the additional losses at DFG.

In support of this argument, Tyson points out that the parties knew how to qualify representations and warranties when they wished to do so. For example, § 5.16 in the Agreement is a representation regarding IBP's compliance with its legal obligations. The Agreement contains no Schedule 5.16, but § 5.16 expressly references Schedules 5.11, 5.12, and 5.19. Likewise, the Agreement's disclosure schedule states that "[i]tems disclosed for any one section of this Disclosure Schedule are deemed to be disclosed for all other sections of this Disclosure Schedule to the extent that it is reasonably apparent that such disclosure is applicable to other such section(s)." Had the drafters wished to provide that each Schedule would qualify each representation and warranty, this language could have been easily altered to accomplish that purpose plainly.[108] Furthermore, the parties agreed that the disclosure schedule was "qualified in its entirety by reference to specific provisions of the Agreement...." As a result, Tyson argues that the scope of Schedule 5.11 is qualified by the flat warranties in §§ 5.07–

5.09. In sum, Tyson contends that a written deal is a written deal. Having plainly warranted the material accuracy of the Warranted Financial Statement as a closing condition, IBP is stuck.

■ For reasons I now explain, my reading of the Agreement suggests that Tyson's reading is not the only reasonable one and that it is therefore appropriate to consider parol evidence in determining the meaning of the Agreement. As a general matter, the strength of Tyson's interpretation—its simplicity and laser beam focus on the language of §§ 5.07–5.09—is also its weakness. When these sections are considered in light of the overall Agreement and the undisputed factual context in which the parties were contracting, the Tyson reading becomes far less than compulsory.

I begin at § 5.11 itself. That section says that "[e]xcept as set forth in Schedule 5.11 [or the Warranted Financials], there are no liabilities of the Company or any Subsidiary of any kind whether accrued, contingent, absolute, determinable or otherwise ...." Schedule 5.11 itself states that in addition to what was disclosed in the Warranted Financials, there may be *"further liabilities* (in addition to IBP's *restatement of earnings* in its 3rd Quarter 2000) associated with certain *improper accounting practices* at DFG Foods."[109] Taken together, § 5.11 and Schedule 5.11 use the term "liabilities" in a broad and imprecise manner that would not be used by an accountant. Certainly, Schedule 5.11 can reasonably be read to include additional charges to earnings associated with improper accounting practices at DFG within the term, along with any other liabilities—such as litigation risks—associated with those practices.

---

**108.** Tyson cites to another merger agreement in which the Wachtell, Lipton firm used this technique. DX 1207.

**109.** Emphasis added.

Section 5.11 expressly contemplates that scheduled liabilities of this nature are not reflected in the Warranted Financials, but will be in addition to those contained in the Warranted Financials, *regardless of when the events giving rise to the liabilities arose.* Tyson largely acknowledges that this is the most reasonable reading of § 5.11 and Schedule 5.11.

But it argues that the fact that IBP could recognize potentially unlimited liabilities because of *past* accounting improprieties at DFG does not mean that DFG was free to restate the Warranted Financials without breaching the Agreement. That is, what was contractually important to the parties was the particular document in which such liabilities were publicly disclosed, rather than the magnitude of such liabilities. To be specific, under Tyson's reading, IBP was free to take a charge to earnings of $45 million in its fourth quarter 2000 10–Q, even if that charge related to accounting improprieties that had taken place in prior periods.[110] What IBP was not permitted to do was to disclose an identical charge as a restatement to the Warranted Financials because that would violate the "flat" warranties in §§ 5.07–5.09.

The record reveals that this sort of hairsplitting has no rational commercial purpose. At trial, Tyson's CFO Hankins was asked directly to explain what difference it made whether the DFG charges were disclosed in a restatement to the Warranted Financials as opposed to a later filing. Hankins at first could not even understand the issue, which alone is telling given its significance in this case and Hankins' active role in it. Once he understood the question, Hankins paused for a very lengthy period of time, until basically admitting that he could not come up with a reason why the filing in which the liabilities were recognized was consequential. Subsequent Tyson witnesses—who were all on notice that this question would likely be asked—had no better answer.[111] In fact, Tyson's General Counsel Baledge admitted that it made no economic difference whether the Warranted Financials were restated to record the liabilities or whether those liabilities were recorded in a filing for a later period.[112]

■ Tyson's interpretation is one that would be "unreal to men of business and practical affairs."[113] New York law disfavors a reading of a contract that produces capricious and absurd results, in favor of a reading that is reasonable in the commercial context in which the parties were contracting.[114]

To rebut this conclusion, Tyson has argued that §§ 5.07–5.09 "look to the past" and "do not identify future risks."[115] Meanwhile, Schedule 5.11 is supposedly forward-looking and only "warrants that

---

**110.** Tyson is not always consistent, however. In its brief, Tyson argues that the Restated Financials were evidence of a breach, not the breach itself. But if the breach itself was the DFG earnings charges that resulted from accounting improprieties during the periods covered by the Warranted Financials, IBP was in breach from the date of signing the Agreement and Tyson knew it, thus turning the contract into a pure option on Tyson's part.

**111.** Tr. 2270–72, 2617–19.

**112.** Tr. 2522.

**113.** *Wendel Foundation v. Moredall Realty Corp.,* 282 N.Y. 239, 26 N.E.2d 241, 243 (1940).

**114.** *Id.; see also Farrell Lines, Inc. v. City of New York,* 30 N.Y.2d 76, 330 N.Y.S.2d 358, 281 N.E.2d 162, 165 (1972); *In the Matter of Friedman,* 64 A.D.2d 70, 407 N.Y.S.2d 999, 1006 (1978).

**115.** Tyson Post Tr. Ans. Br. at 12.

there are no contingencies that may result in IBP obligations in the future to a third party (such as litigation against the company) other than those disclosed in the [Warranted Financials] and Schedule 5.11." [116]

There are several reasons why this construction is not mandated. First, as noted, the term "liabilities" in Schedule 5.11 seems to clearly encompass charges to earnings of the kind taken in the third quarter 2000 10-Q so long as those charges resulted from the same kind of *past* accounting irregularities that produced the initial charges. Second is Tyson's past and future reading of the Agreement. Tyson contends that its past/future construction makes sense because a restatement of past financial statements adversely affects market perception and subjects the company to fraud suits by investors, as it did here. [117] Supposedly, Tyson did not want to accept this sort of risk. Yet, by its own argument, Tyson admits that Schedule 5.11 allocates to Tyson the risk of any liability that arose from "improper accounting practices" at DFG, including liability from lawsuits based on the practices. Tyson's logic is simply sliced too thin to sustain a finding that its construction is the only reasonable one.

Perhaps most importantly, Tyson's argument fails to address Schedule 5.11's reference to Schedule 5.13. Schedule 5.13 discloses that IBP is engaged in an "inventory accounting method dispute" with the

Internal Revenue Service, and that the "issue of past years has yet to be formally resolved" and "[t]ax years 1992 to date are still open." Sections 5.07–5.09 do not cross-reference Schedule 5.13. Under Tyson's argument, it could walk away from the contract if the IRS determines that IBP's inventory accounting methods used in the Warranted Financials was improper and that a restatement of them is required. That reading of the Agreement therefore produces a silly result, which supports IBP's contention that §§ 5.07–5.09 cannot be read woodenly in isolation from the other provisions of the Agreement. [118]

As IBP notes, Schedule 5.11's reference to Schedule 5.13 is of interpretative significance for another reason. By including a reference to Schedule 5.13 and this "inventory" dispute, Schedule 5.11 again signals that the word "liabilities" was being used as a loose term for balance sheet adjustments that might affect prior warranted periods. This cuts against the view that Tyson's reading is the only reasonable construction.

So too does language in the Annexes to the Agreement. These Annexes are of great significance because they govern the circumstances under which Tyson was free to abandon its Cash and Exchange Offers, as well as the Merger. Each of the applicable Annexes provides that Tyson may refuse to close if the representations and

116. *Id.*

117. Securities lawsuits were filed based on the DFG-related issues in the Restated Financials. The record does not support the conclusion that IBP faces material risk from the suits, because its top management and board were victimized by Zahn and did not act with scienter.

118. Section 2.01(e) & (h) of the Agreement also casts doubt on Tyson's rigid reading. That provision requires IBP to "correct

promptly" any information (*e.g.*, the Warranted Financials) provided to Tyson for use in its offer documents "which shall have become false or misleading" so that Tyson could file corrected offer documents with the SEC. Section 2.01 thus appears to contemplate the possibility that there would be a need to correct historical—*i.e.*, past—financial information IBP had previously reported to the SEC and that this eventuality in itself would not be fatal to IBP's right to have the Merger consummated.

warranties in the Agreement are not true "except as affected by actions specifically permitted by" the Merger Agreement.[119] IBP argues that this proviso is essentially a contract-specific articulation of the New York law principle that more specific sections of a contract govern over more general ones, when there is an inconsistency between the two.[120]

According to IBP, Schedule 5.11 specifically permits IBP to recognize further liabilities on account of the accounting improprieties at DFG. Thus, according to IBP, the Annexes protect IBP by ensuring that its specific contractual right to do so does not result in a technical breach of a more general representation and warranty that permits Tyson to walk. IBP supports this contention by pointing to the Model Stock Purchase Agreement produced by the American Bar Association's Committee on Negotiated Acquisitions. The Committee Commentary states:

> The Sellers may also request that the 'bring down' clause [i.e., the Annexes] be modified to clarify that the Buyer will not have a 'walk right' if any of the Sellers' representations is rendered inaccurate as a result of an occurrence specifically contemplated by the acquisition agreement. The requested modification entails inserting the words 'except as contemplated or permitted by this Agreement' (or some similar qualification).[121]

Tyson's response to this line of argument is again quite literalistic and technical, rather than commonsensical. At most, Tyson says, Schedule 5.11 operates solely to prevent IBP's recognition of additional liabilities for accounting improprieties from causing a breach of § 5.11; it does not specifically permit IBP "to incur liabilities related to DFG." [122] And if it did, IBP would be in breach of its covenant not to take any action that would make a representation or warranty untrue.[123] Rejection of Tyson's first contention in this regard, largely disposes of its second. It makes little sense to say that Schedule 5.11 does not specifically permit IBP to recognize additional liabilities at DFG on account of the improper accounting there. That appears to be its plain purpose, and to clearly extend to liabilities that were caused by improper past activities.[124] And if IBP is "specifically permitted to" take such action, it is implausible to think that the Agreement would construe that same action as a breach of covenant. Rather, it seems more commercially reasonable to read the proviso in the Annexes, as IBP does, as a safe-guard that ensures that more specific aspects of the representations and warranties in the Agreement will govern over the more general, when giving literal effect to both the general and specific provisions produces an unreasonable result.

For all these reasons, I conclude that Tyson's reading of the language of the contract is not the only reasonable one.

119. Agreement, Annex I(d), Annex III § 14(d).

120. *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 150 N.Y.S.2d 171, 133 N.E.2d 688, 690 (1956); *Bank of Tokyo–Mitsubishi, Ltd. v. Kvaerner*, 243 A.D.2d 1, 671 N.Y.S.2d 905, 910 (1998); 2 *Farnsworth on Contracts* § 7.11, at 284–285 (1998); 5 *Corbin on Contracts* § 24.23, at 254 (rev. ed.1998).

121. *Model Stock Purchase Agreement*, 1995 A.B.A. Sec. Bus. L. § 7, at 163.

122. Tyson Post Tr. Ans. Br. at 11.

123. Agreement § 7.01(i).

124. In a similar vein, it is plausible that IBP would be specifically permitted to restate its inventory based on the inventory dispute with the IRS disclosed in Schedules 5.11 and 5.13.

Indeed, if forced to choose, I would find that IBP's reading of the Agreement is the one that is most reasonable in view of the overall language and structure of the Agreement, and commercial setting within which the parties were operating. The Tyson interpretation in essence reads the DFG disclosure in Schedule 5.11 out of the Agreement because it gives IBP no reasonable room to address additional charges to earnings on account of past accounting improprieties. Put differently, Tyson argues that it came out of a hotly contested auction with an option, rather than an obligation, to purchase IBP, having silently pocketed an almost sure walk-away right. By contrast, the IBP reading continues to give wide scope to §§ 5.07–5.09, but merely qualifies their application when necessary to give effect to a more specific provision of the contract.

2. *The Parol Evidence Demonstrates That IBP's Reading Of The Agreement Is In Large Measure The Correct One*

The parol evidence supports IBP's position. The representations and warranties in the Agreement were lifted for the most part from the pre-existing Rawhide merger agreement. Tyson's lawyers created the first draft of the Agreement using the Rawhide agreement because it was one that contained representations and warranties favorable to a buyer.

By contrast, Schedule 5.11 was created specifically to address the DFG issues that had been discussed by representatives of Tyson and IBP during the December 29 call in which Shipley provided Tyson with

updated information regarding IBP's year 2000 results.[125] During that conversation, Shipley had informed Tyson that there would be more large charges to earnings because of improprieties at DFG, that an asset impairment study was beginning, and that IBP was not done with its accounting for the problems.

Hagen drafted Schedule 5.11 to address the DFG issues dealt with during the December 29 call and told the Tyson negotiators that this was her intention. She did so during a conference call with Tyson's in-house counsel Read Hudson and outside counsel Millbank Tweed that had been set up to permit Tyson to ask any questions it wanted regarding the disclosure schedules. During that call, Hagen specifically noted that the Schedule was to cover a subject addressed during the December 29 call with Shipley.[126] The evidence also reveals that Hudson had reviewed Schedule 5.11 with Tyson Senior Finance Vice President Dennis Leatherby, who had participated in the December 29 call. Hudson testified at his deposition that "Based on the knowledge [Leatherby] had and based on the representation and the exception from the representation contained in there, I think he was satisfied that, you know, he was willing to go forward with that disclosure."[127] *Tyson elected not to have any of its witnesses who participated in the December 29 conference call about the disclosure schedules testify, even though several of its participants in that call were present throughout the trial.*

The record therefore reveals that Tyson's negotiators knew that Hagen be-

---

**125.** *Trans Pacific Leasing Corp. v. Aero Micronesia, Inc.,* 26 F.Supp.2d 698, 709 (S.D.N.Y.1998) ("separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated"); *see also* Restatement (Second) of Contracts § 203(d) (1979) (same).

**126.** Hlawaty Dep. at 95–98.

**127.** Hudson Dep. at 174–179.

lieved that Schedule 5.11 covered the DFG items discussed at the December 29 call. Reasonable and forthright negotiators for Tyson would—and I find did—understand Hagen as expressing her view that the Schedule ensured that Tyson was accepting the fully disclosed risk that IBP would recognize additional charges because of the accounting improprieties at DFG and that such additional charges would not give Tyson a right to walk away.[128]

To the extent that the Tyson negotiators had a question whether Hagen's carve-out was intended to permit IBP to recognize these additional charges resulting from past accounting practices by way of a restatement of the Warranted Financials, they should have spoken up. The current, hairsplitting interpretation that Tyson advances was never voiced to Hagen at the time, and I do not think that the Tyson negotiators embraced that interpretation at the time. Rather, the Tyson negotiators' attitude reflected the relative unimportance that Tyson's top executives placed on DFG. The decisionmakers at Tyson were comfortable with accepting the risk of further charges to earnings from DFG because of past accounting practices, without focus on the filing in which such charges were taken. This conclusion is buttressed by the fact that Tyson's top inside lawyer, Baledge, and its top outside lawyer, Lederman, were unaware of the DFG Schedule until after the Agreement was signed, as was Tyson's CEO John Tyson.

The later behavior of Tyson also supports this inference. From at latest January 16, 2001 onward, Tyson knew that IBP would almost certainly have to restate the Warranted Financials to record additional charges to earnings because of the DFG accounting problems.[129] At no time did it express the view that such a restatement would, in itself, give rise to a right on Tyson's part to walk away. To the contrary, Tyson simply urged IBP to get the issue worked out with the SEC promptly. Indeed, Hudson, the Tyson in-house lawyer who participated in approving Schedule 5.11 congratulated Hagen when the restatements were filed. John Tyson did not care about the filing in which IBP disclosed the DFG problem, he just wanted IBP to "get it right." [130] This course of dealing under the Agreement is at odds with Tyson's construction.[131]

The reason for this later course of dealing is obvious: none of the Tyson negotiators harbored the belief that the particular filing in which IBP recognized the charges had any relationship to whether the Agreement was breached.[132] After all, they knew that the accounting problems at DFG were likely caused by the fraudulent acts of Andrew Zahn, who had left DFG during the period covered by the Warranted Financials. Before the Merger Agreement was signed, Tyson representatives suspected that a restatement of the Warranted Financials might be necessary[133] for just this reason. The problems that

128. Restatement (Second) of Contracts § 201(2) (1979).

129. PX 197.

130. Tr. 2270–2272.

131. *Federal Ins. Co.*, 691 N.Y.S.2d at 512.

132. If the parties had focused on this particular nicety on the December 30 negotiation call, I have no doubt that Tyson's negotiators would have accepted the risk of the additional DFG charges, regardless of the filings in which such charges would be set forth. *Herbert Rosenthal Jewelry Corp. v. St. Paul Fire & Marine Ins. Co.*, 21 A.D.2d 160, 249 N.Y.S.2d 208, 214 (1964), *aff'd*, 17 N.Y.2d 857, 271 N.Y.S.2d 287, 218 N.E.2d 327 (1966).

133. McCaleb Dep. at 91–95.

gave rise to the need for additional charges had occurred in the past, and the additional charges were far larger than the previously disclosed $9 million problem, and had to be recognized sometime. Therefore, it is reasonable to infer that Tyson's negotiators believed that these charges had been carved out entirely by Schedule 5.11.

■ I reach a different conclusion, however, regarding the Impairment Charge. While I have found that the issue of a possible impairment was touched upon in the December 29 meeting, it was not as clearly a focal point as the issue of additional earnings charges. Most important, Hagen's draft of Schedule 5.11 is not without boundaries as applied to DFG. While Tyson's negotiators could not have reasonably understood Schedule 5.11 as anything other than a total carve-out for the earnings charges, that is not the case with the Impairment Charge. The reason why is fundamental. Schedule 5.11 only addresses additional liabilities—expansively defined—"associated with certain improper accounting practices at DFG Foods." Hagen did not give Tyson any reason to believe that she intended Schedule 5.11 to cover any problem lacking this "association." IBP told the SEC that the impairment study was not triggered by the mismanagement and accounting improprieties at DFG, but by an unexpected and severe drop in sales in the fourth quarter.[134] Therefore, Schedule 5.11 does not cover that Charge.

### 3. *Schedule 5.10 Does Not Cover The Impairment Charge*

IBP argues alternatively that the Impairment Charge was covered by Schedule 5.10 of the Agreement, which states that

"IBP may, *as part of normal year-end adjustments consistent with past practices, revalue assets ....*"[135] According to IBP, its impairment review of DFG's assets falls within this clause, especially because IBP had taken what it considers to be a similar $35 million non-cash charge in FY 1999, when it wrote down assets associated with its decision to exit the cow boning business.

■ IBP's position that it wrote down the DFG asset values by 75% as part of "normal year-end adjustments" is not borne out by the evidence. As previously noted, IBP itself told the SEC that the DFG asset impairment review was triggered by "an unprecedented and precipitous decline in Q4 2000 sales ..."[136] There was nothing "normal" about the DFG review, it was quite unusual, and the language of Schedule 5.10 is not easily read as covering a large write down resulting from an extraordinary impairment review.

### C. *The Other Aspects Of The Restated Financials Do Not Evidence A Breach Of Warranty*

The Restated Financials dealt with three other issues in addition to DFG, which have at times become points of contention in this case.

■ In its opening post-trial brief, Tyson did not argue that these issues would in themselves be sufficient to give it a reason not to close in the event that the DFG-related issues in the Restated Financials were carved out by Schedule 5.11. As a result, I consider Tyson to have waived any arguments about these issues.

Because I may be found wrong on that point, I will address these three issues

---

**134.** DX 168.

**135.** Emphasis added.

**136.** DX 168.

briefly. Under Tyson's literal approach, §§ 5.07–5.09 of the Agreement embrace the view of the world that any error in applying the often-technical rules of GAAP constitutes a breach of warranty, regardless of whether the error would be material to a person using the financial statements to make real world economic decisions.

In their briefs, the parties do battle regarding whether §§ 5.07–5.09 embrace a particular materiality standard. Tyson argues that those sections are written in the language of the federal securities laws and accountant opinion letters, and must be interpreted as written.[137] IBP argues that those sections are contained in a merger agreement between sophisticated parties, and that materiality must be defined by reference to an objectively reasonable acquiror in Tyson's position who has the same mix of information as Tyson had.[138]

■ As an initial matter, I am not sure that the parties' fight about whether a reasonable acquiror or reasonable investor standard is, in itself, material. The more important question is whether the restatements would be influential in the decision-making process of either a reasonable investor or acquiror, having the same total mix of information that Tyson possessed. The Agreement is silent and thus ambiguous on the question of whether materiality of the Restated Financials is to be viewed in isolation, or in relation to the total mix of information. In this regard, I reject Tyson's notion that it is utterly irrelevant whether it possessed full knowledge of material facts that might have been technically misreported in the Restated Financials. Certainly, the plaintiff's knowledge of the underlying facts may render an omission immaterial under the federal securities law, because that law considers materiality in light of the total mix of information that the plaintiff had available. That is, even if Tyson is correct that the contractual language is taken from a federal securities context, that context is one that deals with materiality in view of the totality of information available to the user.[139]

■ The only reason one would take a different approach here is if one has confidence that Tyson bargained for the right to walk away if IBP's Warranted Financials were technically imperfect in any manner. This would have been an odd

137. Tyson cites among other authorities *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ("reasonable investor" standard); Statement of Financial Accounting Concepts No. 1 (public financial statements designed to serve the common interests of a wide variety of constituencies, including lenders and investors).

138. IBP cites cases including *Recupito v. Prudential Securities, Inc.*, 112 F.Supp.2d 449, 459–60 (D.Md.2000) (where financial statement was not prepared in conformance with GAAP, that problem was immaterial where the relevant information was disclosed elsewhere in the filing); *Wollins v. Antman*, 638 F.Supp. 989, 994–95 (E.D.N.Y.1986) (where defendants had disclosed to the buyer of a business information about the company's value, a lost account, and information from which to calculate the value of that loss, the defendants' failure to disclose the total percentage of the company's sales represented by the lost account was not material in view of the total mix of information).

139. *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126 (materiality viewed in context of total information mix); SEC Staff Accounting Bulletin: No. 99—Materiality, 17 CFR Part 211 [Release No. SAB 99] (Aug. 12, 1999) ("In the context of a misstatement of a financial statement item, while the 'total mix' includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item...."); Statement of Financial Accounting Concepts No. 2, ("The better informed decision makers are, the less likely it is that any new information can add materially to what they already know.").

bargaining position for a reasonable investor or acquiror to take, and there is no evidence that Tyson contracted with this idiosyncratic approach in mind. Indeed, if this approach were the governing one under the Agreement, it is hard to explain the presence of subsections (e) and (h) of § 2.01 in the Agreement, since those subsections contemplate the correction of financial statements that have become false.

The course of dealing by the parties under the Agreement reveals that Tyson had a different understanding than it advocates now. Tyson did not believe that a mere restatement of the Warranted Financials would trigger a breach of warranty; rather, it believed that a breach would occur if the restatement was material. Tyson's pre-litigation understanding comports with the commercial context in which the parties were operating. Its present hair-trigger approach does not.

In any event, while this duel might have had great importance if the DFG-related issues were not carved out, it has little importance regarding the remaining issues. As a distinguished expert testified at trial, past financial reports are not restated merely because the preparer had made a technical error under GAAP.[140] Such technical errors can be fixed on a prospective basis, so long as the errors did not have a material impact on prior periods. The three remaining issues that were contained in IBP's restatements were not material, when viewed from the perspective of a reasonable "public" user of its financial statements who was making a decision whether to invest in IBP as of the end of 2000.

■ The first issue was the issue of accounting for IBP's stock option plan as a "variable" rather than "fixed plan." IBP had not hidden its prior accounting from any user of its financial statements. It had clearly told users of its financial statements that it was treating the plan as a fixed one, and indicated that another treatment was possible. The actual economic consequences of the plan were identical under either approach, but for accounting reasons the "variable" plan has an income statement effect. The Restated Financials contained this income effect, which in totality was basically a wash over all the periods it affected. A reasonable user of the financial statements would not view these effects as material given what had already been disclosed about this issue because the problem, if any, that this change in treatment caused could be fixed as to future periods. In the absence of the DFG problem, IBP most likely could have made this accounting change on a prospective basis only. Indeed, Tyson executives had "discussed [this issue] on several occasions" before the Merger Agreement was signed.[141] Moreover, IBP had already come up with a fix to the problem on a going-forward basis, which Tyson had approved.[142]

■ The second issue is that IBP provided new segment reporting in the Restated Financials. Segment reporting is an SEC "hot topic." Absent the DFG problem, IBP could have dealt with this problem on a going-forward basis. No reasonable user of IBP financial statements would have found any problems with IBP's segment reporting material to prior periods. Segment reporting in no manner affects IBP's bottom line. And Tyson, of course, had access to segmented results from IBP.

---

**140.** Tr. 962 (testimony of Roman Weil citing APB Opinion No. 20–Accounting Changes).

**141.** PX 276.

**142.** *Id.*

■ The third issue is that IBP also agreed to change its revenue recognition policies retroactively. This was another SEC hot topic that was the subject of recent SEC guidance requiring companies to comply with new revenue recognition guidelines.[143] IBP voluntarily decided to adopt these guidelines retroactively because it was already restating the Warranted Financials. IBP had in fact announced its intent to implement the new approach required by the SEC in its original third quarter 10-Q for FY 2000.[144] IBP correctly indicated then that the adoption of that new approach would not have a material affect on the company's earnings. In March 2001, Tyson itself indicated that it would be adopting the new SEC standard in the near future and that the standard would have no material effect.[145] Absent the need to restate because of the DFG issues, IBP would not have had to restate the Warranted Financials to deal with this minor issue and no reasonable public investor would have cared if it had not.

### D. Was Tyson's Termination Justified Because IBP Has Suffered A Material Adverse Effect?

Tyson argues that it was also permitted to terminate because IBP had breached § 5.10 of the Agreement, which is a representation and warranty that IBP had not suffered a material adverse effect since the "Balance Sheet Date" of December 25, 1999, except as set forth in the Warranted Financials or Schedule 5.10 of the Agreement. Under the contract, a material adverse effect (or "MAE") is defined as "any event, occurrence or development of a state of circumstances or facts which has had or reasonably could be expected to have a Material Adverse Effect" ... "on the condition (financial or otherwise), business, assets, liabilities or results of operations of [IBP] and [its] Subsidiaries taken as whole . . . ."[146]

Tyson asserts that the decline in IBP's performance in the last quarter of 2000 and the first quarter of 2001 evidences the existence of a Material Adverse Effect. It also contends that the DFG Impairment Charge constitutes a Material Adverse Effect. And taken together, Tyson claims that it is virtually indisputable that the combination of these factors amounts to a Material Adverse Effect.

In addressing these arguments, it is useful to be mindful that Tyson's publicly expressed reasons for terminating the Merger did not include an assertion that IBP had suffered a Material Adverse Effect. The post-hoc nature of Tyson's arguments bear on what it felt the contract meant when contracting, and suggests that a short-term drop in IBP's performance would not be sufficient to cause a MAE. To the extent the facts matter, it is also relevant that Tyson gave no weight to DFG in contracting.

The resolution of Tyson's Material Adverse Effect argument requires the court to engage in an exercise that is quite imprecise. The simplicity of § 5.10's words is deceptive, because the application of those words is dauntingly complex. On its face, § 5.10 is a capacious clause that puts IBP at risk for a variety of uncontrollable factors that might materially affect its overall business or results of operation as a whole. Although many merger contracts

**143.** S.E.C. Staff Accounting Bulletin Number 101.

**144.** PX 40.

**145.** PX 370, at 5–6.

**146.** Agreement § 5.10(a) (specific warranty dealing generally with MAE); § 5.01 (defining MAE for entire agreement).

contain specific exclusions from MAE clauses that cover declines in the overall economy or the relevant industry sector, or adverse weather or market conditions,[147] § 5.10 is unqualified by such express exclusions.

IBP argues, however, that statements in the Warranted Financials that emphasize the risks IBP faces from swings in livestock supply act as an implicit carve-out, because a Material Adverse Effect under that section cannot include an Effect that is set forth in the Warranted Financials. I agree with Tyson, however, that these disclaimers were far too general to preclude industry-wide or general factors from constituting a Material Adverse Effect. Had IBP wished such an exclusion from the broad language of § 5.10, IBP should have bargained for it. At the same time, the notion that § 5.10 gave Tyson a right to walk away simply because of a downturn in cattle supply is equally untenable. Instead, Tyson would have to show that the event had the required materiality of effect.[148]

The difficulty of addressing that question is considerable, however, because § 5.10 is fraught with temporal ambiguity. By its own terms, it refers to any Material Adverse Effect that has occurred to IBP since December 25, 1999 unless that Effect is covered by the Warranted Financials or Schedule 5.10. Moreover, Tyson's right to refuse to close because a Material Adverse Effect has occurred is also qualified by the other express disclosures in the Schedule, by virtue of (i) the language of the Annexes that permits Tyson to refuse to close for breach of a warranty unless that breach results from "actions specifically permitted" by the Agreement; and (ii) the language of the Agreement that makes all disclosure schedules apply to Schedule 5.10 where that is the reasonably apparent intent of the drafters. Taken together, these provisions can be read to require the court to examine whether a MAE has occurred against the December 25, 1999 condition of IBP as adjusted by the specific disclosures of the Warranted Financials and the Agreement itself. This approach makes commercial sense because it establishes a baseline that roughly reflects the status of IBP as Tyson indisputably knew it at the time of signing the Merger Agreement.

But describing this basic contractual approach is somewhat easier than applying it. For example, the original IBP 10–K for FY 1999 revealed the following five-year earnings from operations and earnings per share before extraordinary items:

| | 1999 | 1998 | 1997 | 1996 | 1995 |
|---|---|---|---|---|---|
| Earnings from Operations (in thousands) | $ 528,473 | 373,735 | 226,716 | 322,908 | 480,096 |
| Net Earnings Per Share | $ 3.39 | 2.21 | 1.26 | 2.10 | 2.96 |

---

147. *See generally* Rod J. Howard, *Deal Risk, Announcement Rick, and Interim Changes— Allocating Risks in Recent Technology M & A Agreements,* 1219 PLI/Corp. 217 (Dec.2000); Joel I. Greenberg & A. Julia Haddad, *The Material Adverse Change Clause,* N.Y.L.J. 55 (Apr. 23, 2001).

148. *But see Pittsburgh Coke & Chem. Co. v. Bollo,* 421 F.Supp. 908, 930 (E.D.N.Y.1976) (where Material Adverse Condition ("MAC") clause applied to a company's "financial condition", "business", or "operations," court read that clause narrowly to exclude "technological and economic changes in the aviation industry which undoubtedly affected the business of all who had dealings with that industry").

The picture that is revealed from this data is of a company that is consistently profitable, but subject to strong swings in annual EBIT and net earnings. The averages that emerge from this data are of EBIT of approximately $386 million per year and net earnings of $2.38 per share. If this average is seen as weighting the past too much, a three-year average generates EBIT of $376 million and net earnings of $2.29 per share.

The original Warranted Financials in FY 2000 also emphasize that swings in IBP's performance were a part of its business reality. For example, the trailing last twelve month's earnings from operations as of the end of third quarter of FY 2000 were $462 million, as compared to $528 million for full year 1999, as originally reported.[149] In addition, the third quarter 10–Q showed that IBP's earnings from operations for the first 39 weeks of 2000 were lagging earnings from operations for the comparable period in 1999 by $40 million, after adjusting for the CFBA Charges.[150]

The financial statements also indicate that Foodbrands was hardly a stable source of earnings, and was still much smaller in importance than IBP's fresh meat operations. Not only that, FY 2000 Foodbrands performance was lagging 1999, even accounting for the unusual, disclosed items.

The Rawhide Projections add another dimension to the meaning of § 5.10. These Projections indicated that IBP would not reach the same level of profitability as originally reported *until FY 2004*. In FY 2001, IBP was expected to have earnings from operations of $446 and net profits of $1.93 a share, down from what was expected in FY 2000. This diminishment in expectations resulted from concern over an anticipated trough in the cattle cycle that would occur during years 2001 to 2003. Moreover, the performance projected for FY 2001 was a drop even from the reduced FY 2000 earnings that Tyson expected as of the time it signed the Merger Agreement.

These negotiating realities bear on the interpretation of § 5.10 and suggest that the contractual language must be read in the larger context in which the parties were transacting. To a short-term speculator, the failure of a company to meet analysts' projected earnings for a quarter could be highly material. Such a failure is less important to an acquiror who seeks to purchase the company as part of a long-term strategy.[151] To such an acquiror, the important thing is whether the company has suffered a Material Adverse Effect in its business or results of operations that is consequential to the company's earnings power over a commercially reasonable period, which one would think would be measured in years rather than months. It is odd to think that a strategic buyer would view a short-term blip in earnings as material, so long as the target's earnings-generating potential is not materially affected by that blip or the blip's cause.[152]

---

149. *See* PX 27, at 13; PX 40, at 3.

150. PX 40, at 3, 14.

151. James C. Freund, *Anatomy Of A Merger: Strategies and Techniques for Negotiating Corporate Acquisitions* 246 (Law Journals Seminars–Press 1975) ("[W]hatever the concept of

materiality may mean, at the very least it is always relative to the situation.").

152. *Pine State Creamery Co. v. Land–O–Sun Dairies, Inc.*, 201 F.3d 437, 1999 WL 1082539, at *6 (4th Cir.1999) (*per curiam*) (whether severe losses during a two month

In large measure, the resolution of the parties' arguments turns on a difficult policy question. In what direction does the burden of this sort of uncertainty fall: on an acquiror or on the seller? What little New York authority exists is not particularly helpful, and cuts in both directions. One New York case held a buyer to its bargain even when the seller suffered a very severe shock from an extraordinary event, reasoning that the seller realized that it was buying the stock of a sound company that was, however, susceptible to market swings.[153] Another case held that a Material Adverse Effect was evidenced by a short-term drop in sales, but in a commercial context where such a drop was arguably quite critical.[154] The non-New York authorities cited by the parties provide no firmer guidance.

■ Practical reasons lead me to conclude that a New York court would incline toward the view that a buyer ought to have to make a strong showing to invoke a Material Adverse Effect exception to its obligation to close. Merger contracts are heavily negotiated and cover a large number of specific risks explicitly. As a result, even where a Material Adverse Effect condition is as broadly written as the one in the Merger Agreement, that provision is best read as a backstop protecting the acquiror from the occurrence of unknown events that substantially threaten the overall earnings potential of the target in a durationally-significant manner.[155] A short-term hiccup in earnings should not suffice; rather the Material Adverse Effect should be material when viewed from the longer-term perspective of a reasonable acquiror. In this regard, it is worth noting that IBP never provided Tyson with *quarterly* projections.

When examined from this seller-friendly perspective, the question of whether IBP has suffered a Material Adverse Effect remains a close one. IBP had a very subpar first quarter. The earnings per share of $.19 it reported exaggerate IBP's success, because part of those earnings were

period evidenced a MAC was a jury question where there was evidence that the business was seasonal and that such downturns were expected as part of the earnings cycle of the business).

153. *Bear Stearns Co. v. Jardine Strategic Holdings*, No. 31371187, slip. op. (N.Y.Supr. June 17, 1988), aff'd mem., 143 A.D.2d 1073, 533 N.Y.S.2d 167 (1988) (Tender offeror who was to purchase 20% of Bear Stearns could not rely on the MAC clause to avoid contract despite $100 million loss suffered by Bear Stearns on Black Monday, October 19, 1997, and the fact that Bear Stearns suffered a $48 million quarterly loss, its first in history. The buyer knew that Bear Stearns was in a volatile cyclical business.).

154. In *Pan Am Corp. v. Delta Air Lines*, 175 B.R. 438, 492–493 (S.D.N.Y.1994), Pan Am airlines suffered sharp decline in bookings over a three-month period that was shocking to its management. The court held that a MAC had occurred. It did so, however, in a context where the party relying on the MAC clause was providing funding in a work-out situation, making any further deterioration of Pan Am's already compromised condition quite important.

In another New York case, *Katz v. NVF Co.*, 100 A.D.2d 470, 473 N.Y.S.2d 786 (1984), two merger partners agreed that one partner has suffered a material adverse change when its full year results showed a *net loss* of over $6.3 million, compared to a $2.1 million profit a year before, and steep operating losses due to plant closure. *Id.* at 788. The *Katz* case thus presents a negative change of much greater magnitude and duration than exists in this case.

155. A contrary rule will encourage the negotiation of extremely detailed "MAC" clauses with numerous carve-outs or qualifiers. An approach that reads broad clauses as addressing fundamental events that would materially affect the value of a target to a reasonable acquiror eliminates the need for drafting of that sort.

generated from a windfall generated by accounting for its stock option plan, a type of gain that is not likely to recur. On a normalized basis, IBP's first quarter of 2001 earnings from operations ran 64% behind the comparable period in 2000. If IBP had continued to perform on a straight-line basis using its first quarter 2001 performance, it would generate earnings from operations of around $200 million. This sort of annual performance would be consequential to a reasonable acquiror and would deviate materially from the range in which IBP had performed during the recent past.[156]

Tyson says that this impact must also be coupled with the DFG Impairment Charge of $60.4 million. That Charge represents an indication that DFG is likely to generate far less cash flow than IBP had previously anticipated.[157] At the very least, the Charge is worth between $.50 and $.60 cents per IBP share, which is not trivial. It is worth even more, says Tyson, if one realizes that the Rawhide Projections portrayed Foodbrands as the driver of increased profitability in an era of flat fresh meats profits. This deficiency must be considered in view of the overall poor performance of Foodbrands so far in FY 2001. The Rawhide Projections had targeted Foodbrands to earn $137 million in 2001. In a January 30, 2001 presentation to Tyson, Bond had presented an operating plan that hoped to achieve $145 million from Foodbrands. As of the end of the first quarter, Foodbrands had earned only $2

million, and thus needed another $135 million in the succeeding three quarters to reach its Rawhide Projection. IBP's overall trailing last twelve month's earnings had declined from $488 million as of the end of the third quarter of 2000 to $330 million.[158]

As a result of these problems, analysts following IBP issued sharply reduced earnings estimates for FY 2001. Originally, analysts were predicting that IBP would exceed the Rawhide Projections in 2001 by a wide margin. After IBP's poor first quarter, some analysts had reduced their estimate from $2.38 per share to $1.44 a share.[159] *Even accounting for Tyson's attempts to manipulate the analyst community's perception of IBP,* this was a sharp drop.

Tyson contends that the logical inference to be drawn from the record evidence that is available is that IBP will likely have its worst year since 1997, a year which will be well below the company's average performance for all relevant periods. As important, the company's principal driver of growth is performing at markedly diminished levels, thus compromising the company's future results as it enters what is expected to be a tough few years in the fresh meats business.

IBP has several responses to Tyson's evidence. IBP initially notes that Tyson's arguments are unaccompanied by expert evidence that identifies the diminution in IBP's value or earnings potential as a result of its first quarter performance.[160]

156. *See Raskin v. Birmingham Steel Corp.,* Del.Ch., 1990 WL 193326, at *5, Allen, C. (Dec. 4, 1990) (while "a reported 50% decline in earnings over two consecutive quarters might not be held to be a material adverse development, it is, I believe unlikely to think that might happen").

157. The Impairment Charge was, of course, signaled by Shipley's reduced estimate for

DFG in FY 2001, and his indication that an impairment study was underway.

158. Tr. 693–94.

159. Tr. 2791–92.

160. It has admittedly taken its own payment multiples based on the Rawhide Projections and simply "valued" the effect that way. But

The absence of such proof is significant. Even after Hankins generated extremely pessimistic projections for IBP in order to justify a lower deal price, Merrill Lynch still concluded that a purchase of IBP at $30 per share was still within the range of fairness and a great long-term value for Tyson. The Merrill Lynch analysis casts great doubt on Tyson's assertion that IBP has suffered a Material Adverse Effect.[161]

IBP also emphasizes the cyclical nature of its businesses. It attributes its poor first quarter to an unexpectedly severe winter. This led ranchers to hold livestock back from market, causing a sharp increase in prices that hurt both the fresh meats business and Foodbrands. Once April was concluded, IBP began to perform more in line with its recent year results, because supplies were increasing and Foodbrands was able to begin to make up its winter margins. Bond testified at trial that he expects IBP to meet or exceed the Rawhide Projection of $1.93 a share in 2001, and the company has publicly indicated that it expects earnings of $1.80 to $2.20 a share. Peterson expressed the same view.

IBP also notes that any cyclical fall is subject to cure by the Agreement's termination date, which was May 15, 2001. By May 15, IBP had two weeks of strong earnings that signaled a strong quarter ahead. Moreover, by that time, cattle that had been held back from market were being sold, leading to plentiful supplies that were expected to last for most of the year.

Not only that, IBP notes that not all analyst reporting services had been as pessimistic as Tyson portrays.[162] In March, Morningstar was reporting a mean analyst prediction of $1.70 per share for IBP in 2001.[163] By May, this had grown to a mean of $1.74 a share.[164] Throughout the same period, Morningstar's consensus prediction was an FY 2002 performance of $2.33 range in March, and $2.38 in May.[165] Therefore, according to Morningstar, the analyst community was predicting that IBP would return to historically healthy earnings next year, and that earnings for this year would fall short of the Rawhide Projections by less than $.20 per share.

IBP also argues that the Impairment Charge does not approach materiality as a big picture item. That Charge is a one-time, non-cash charge, and IBP has taken large charges of that kind as recently as 1999. While IBP does not deny that its decision to buy DFG turned out disastrously, it reminds me that DFG is but a tiny fraction of IBP's overall business and that a total shut-down of DFG would likely have little effect on the future results of a combined Tyson/IBP. And as a narrow asset issue, the charge is insignificant to IBP as a whole.

IBP never warranted that it would meet those Projections.

161. Tyson's only expert on this subject testified that a MAE would have occurred in his view even if IBP met the Rawhide Projections, because those Projections were more bearish than the analysts. This academic theory is of somewhat dubious practical utility, as it leaves the enforceability of contracts dependent on whether predictions by third-parties come true.

162. I take judicial notice of these publicly available estimates, D.R.E. 201, and consider it important to do so given Tyson's heavy reliance on analyst opinion to prove that a Material Adverse Effect has occurred.

163. Morningstar, Inc. estimate for ninety days prior as of June 12, 2001.

164. *Id.,* for thirty days prior as of June 12, 2001.

165. *Id.,* for thirty and ninety days prior as of June 12, 2001.

I am confessedly torn about the correct outcome. As Tyson points out, IBP has only pointed to two weeks of truly healthy results in 2001 before the contract termination date of May 15. Even these results are suspect, Tyson contends, due to the fact that IBP expected markedly better results for the second week just days before the actual results come out. In view of IBP's demonstrated incapacity to accurately predict near-term results, Tyson says with some justification that I should be hesitant to give much weight to IBP's assurances that it will perform well for the rest of the year.

■ In the end, however, Tyson has not persuaded me that IBP has suffered a Material Adverse Effect. By its own arguments, Tyson has evinced more confidence in stock market analysts than I personally harbor. But its embrace of the analysts is illustrative of why I conclude that Tyson has not met its burden.

As of May 2001, analysts were predicting that IBP would earn between $1.50 [166] to around $1.74 [167] per share in 2001. The analysts were also predicting that IBP would earn between $2.33 [168] and $2.42 [169] per share in 2002. These members are based on reported "mean" or "consensus" analyst numbers. Even at the low end of this *consensus* range, IBP's earnings for the next two years would not be out of line with its historical performance during

troughs in the beef cycle. As recently as years 1996–1998, IBP went through a period with a three year average earnings of $1.85 per share. At the high end of the analysts' consensus range, IBP's results would exceed this figure by $.21 per year.

This predicted range of performance from the source that Tyson vouches for suggests that no Material Adverse Effect has occurred.[170] Rather, the analyst views support the conclusion that IBP remains what the baseline evidence suggests it was—a consistently but erratically profitable company struggling to implement a strategy that will reduce the cyclicality of its earnings. Although IBP may not be performing as well as it and Tyson had hoped, IBP's business appears to be in sound enough shape to deliver results of operations in line with the company's recent historical performance. Tyson's own investment banker still believes IBP is fairly priced at $30 per share. The fact that Foodbrands is not yet delivering on the promise of even better performance for IBP during beef troughs is unavailing to Tyson, since § 5.10 focuses on IBP as a whole and IBP's performance as an entire company is in keeping with its baseline condition.

Therefore, I conclude that Tyson has not demonstrated a breach of § 5.10. I admit to reaching this conclusion with less than the optimal amount of confidence.[171] The

166. First Call Earnings Estimate–IBP, Inc. for thirty days prior as of June 12, 2001.

167. Morningstar, Inc. estimate for thirty days prior as of June 12, 2001.

168. First Call Earnings Estimate–IBP, Inc. for thirty days prior as of June 12, 2001.

169. *Id.*

170. Again, I emphasize that my conclusion is heavily influenced by my temporal perspective, which recognizes that even good businesses do not invariably perform at consistent

levels of profitability. If a different policy decision is the correct one, a contrary conclusion could be reached. That different, more short-term approach will, I fear, make merger agreements more difficult to negotiate and lead to Material Adverse Effect clauses of great prolixity.

171. Tyson has tried to suggest that other factors exist that contribute to the conclusion that IBP has suffered a Material Adverse Effect. These include unsubstantiated charges that other Foodbrands units suffer the same type of serious accounting problems as DFG

record evidence is not of the type that permits certainty.[172]

E. *Tyson Was Not Fraudulently Induced To Enter Into The Confidentiality Agreement Or The Merger Agreement*

Tyson argues that it was fraudulently induced to enter into the Confidentiality Agreement and the Merger Agreement. As a result, it contends that those contracts should be rescinded, along with the contract under which Tyson paid the Rawhide termination fee on IBP's behalf.

■ The basic elements Tyson must prove are well-established:

> Under New York law, the essential elements of a claim for fraudulent inducement are: (1) misrepresentation of a material existing fact; (2) falsity; (3) scienter; (4) deception; and (5) injury. Plaintiff must demonstrate that defendant knowingly uttered a falsehood intending to deprive the plaintiff of a benefit and that the plaintiff was thereby deceived and damaged.[173]

Tyson also contends that it was victimized by negligent or innocent misrepresentations. New York law permits rescission if IBP made a negligent or innocent misrepresentation of material fact, so long as Tyson reasonably relied upon that misrep-

resentation to its detriment.[174] "However, the alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition." [175]

■ Tyson also claims that it was injured by material omissions of fact made by IBP during the Merger negotiations. This claim is subject to somewhat different requirements and requires Tyson to "prove the existence of a fiduciary or confidential relationship warranting the trusting party to repose his confidence in the defendant and, therefore, to relax the care and vigilance he would ordinarily exercise in the circumstances." [176]

Tyson bases its rescission claims on alleged misrepresentations or omissions of material fact related to three areas: (1) the Rawhide Projections; (2) audit reports relating to DFG and Foodbrands; and (3) the Comment Letter. I will address each in turn.

■ Before doing that, it is important to place my more specific analysis in some context. The negotiations between IBP and Tyson did not take place between a world-wise, globe-trotting capitalist with an army of advisors on one side, and Jethro Bodine, on the other. Instead, two equally sophisticated parties dealt with

---

and that other IBP assets are impaired, as well as the effects of DFG-related lawsuits that Tyson admits were covered by Schedule 5.11. I find none of Tyson's other Material Adverse Effect arguments meritorious.

**172.** If I am incorrect and IBP bore the burden to prove the absence of a Material Adverse Effect by clear and convincing evidence in order to obtain an order of specific performance, it would not have met that burden. It would prevail under a preponderance standard, regardless of whether it bore the burden of persuasion.

**173.** *Bradbury v. PTN Publishing Co., Inc.,* 1998 WL 386485, at *6 (E.D.N.Y.1998)

(Block, J.) (citations and quotations omitted). The Delaware fraud elements are the same. *See, e.g., Sanders v. Devine,* Del.Ch., C.A. No. 14679, 1997 WL 599539, *7, 1997 Del.Ch. LEXIS 131, at *23, Lamb, V.C. (Sept. 24, 1997).

**174.** *Albany Motor Inn and Restaurant, Inc. v. Watkins,* 85 A.D.2d 797, 445 N.Y.S.2d 616, 617 (1981).

**175.** *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20–21 (2d Cir.2000) (citations omitted).

**176.** 60 N.Y. Jur.2d *Fraud & Deceit* § 2 (1987).

each other at arms' length with the aid of expensive and highly skilled advisors. *Caveat emptor* is still the basic law of New York,[177] and it applies with full force in these circumstances.

■ Not only that, a contextually-specific factor—the Confidentiality Agreement—contributes to the caution with which Tyson should have taken any oral assurances or representations from IBP during the Merger negotiation process. Tyson had agreed that it could not use any oral or written due diligence information (*or omissions therefrom*) as a basis for a lawsuit unless that issue was covered by a specific provision of a subsequent, written contract. As a result, Tyson could not have assumed that it could place reasonable reliance on assurances of IBP that were not reduced to a specific written promise in the Merger Agreement.[178]

While Tyson argues that the Confidentiality Agreement itself should be rescinded, I find otherwise as outlined below.

Alternatively, Tyson contends that the Confidentiality Agreement does not cover the Warranted Financials or the Rawhide Projections because those documents were publicly filed. As such, Tyson argues convincingly that those documents were not Evaluation Material for purposes of that Agreement. What Tyson has not shown is that oral statements about those documents that IBP made during the due diligence process would not fall within the expansively defined "Evaluation Material" category. Likewise, Tyson has not convinced me that the Confidentiality Agreement does not cover information that was in IBP's possession that constituted Evaluation Material, regardless of whether that information was created by IBP or one of its agents. The contractual definition is much broader.[179] Given these factors, Tyson should have been very cautious, indeed.[180]

Finally, the nature of the Merger Agreement itself demonstrates the parties' at-

---

**177.** *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

**178.** *Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974, 975 (1985) (specific contractual agreement that representations outside of contract were not relied upon foreclosed fraud in inducement claim); *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 599 (1959) ("[P]laintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded. Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations."); *see also Harsco Corp. v. Segui,* 91 F.3d 337, 345–48 (2d Cir.1996) (fraud and negligent misrepresentation claims barred by provision that "specifically disclaims representations that are not in the agreement").

**179.** Tyson's skillful advocacy swayed IBP General Counsel Hagen to testify otherwise. Her hurried answer contradicts the text of the Confidentiality Agreement, and the evident in-

tent of the Agreement. Under Tyson's approach, it could sue IBP for damages if IBP's due diligence responses did not provide a copy of a complaint filed against IBP, which could be a common subject of due diligence. The intent of the Confidentiality Agreement is clear: it was designed to require Tyson to waive any deficiencies in due diligence as a basis for suit, unless that deficiency constituted a breach of a representation or warranty in the resulting merger agreement.

**180.** Tyson tries to compare the Confidentiality Agreement's liability limitation to a boilerplate integration clause. But the Confidentiality Agreement is a short and important contract knowingly entered into by Tyson to govern its relationship with IBP. Tyson thus seeks to have this court relieve it of a risk that it assumed with full knowledge and to deprive IBP of its legitimate contractual expectations. Under New York or Delaware law, the Confidentiality Agreement is a clear and enforceable contract that precludes Tyson's plea to be excused from its own commitment.

tentiveness to the need to cover material issues in writing, if they were a concern. The Agreement contains numerous representations and warranties, with lengthy schedules of carve-outs. To the extent that a contracting party chose not to negotiate for specific language regarding an issue, the most plausible inference is that the issue was simply not fundamental enough to buttress a rescission claim.

### 1. *Tyson Cannot Base Rescission On The Rawhide Projections*

Tyson's first argument is that it was assured that the Rawhide Projections were conservative, that IBP believed in them, and that IBP would meet them. It further contends that IBP representatives made statements about the Projections that they knew to be false at the time they were made. I conclude otherwise.

■ First, I do not believe that IBP ever made a misrepresentation of material fact regarding the Rawhide Projections. When first prepared, the Rawhide Projections were based on reasonable assumptions. When the Projections were discussed with Tyson, IBP informed Tyson of those assumptions. IBP also told Tyson about the factors that bore on whether IBP would achieve the anticipated numbers. More fundamentally, Tyson was on notice that it was to read the Rawhide Projections in light of other information that was available to it, including IBP's most recent 10–Q. It was also on notice about when the Projections had been prepared, and that they had not been updated. These factors should have indicated to

Tyson in late November and early December 2000 that IBP would likely fall short of the EBIT target for FY 2000.

Most important, when Tyson signed the Merger Agreement, Tyson had been told that the Rawhide Projections for FY 2000 would not be met by a wide margin. It was also told that IBP's CFO, Shipley, thought IBP could meet the Projections for FY 2001 but that there was no guarantee and that doing so would depend on certain strategies working out. Therefore, before it signed the contract, Tyson knew that the Rawhide Projections were a prediction of future events that had already been proven less than accurate.

Under New York law, the fact that IBP management said that the Projections were based on reasonable assumptions and that IBP expected to meet the Projections does not constitute a material misrepresentation of fact.[181] Expressing confidence about a projection of future results will not support a claim for material misrepresentation.[182]

Nor am I persuaded that IBP management intended to mislead Tyson in any way. The circumstances simply do not support that inference. IBP told Tyson too much information that placed Tyson on notice of the uncertainty of predictions of IBP's future performance. Whatever confidence Peterson and Bond expressed in their company was, I conclude, heart-felt. Likewise, I find that Shipley lacked any intent to deceive. While the IBP side of the negotiation may not have been as promptly forthcoming as was ideal, its fail-

**181.** *See D.H. Cattle Holdings Co. v. Smith,* 195 A.D.2d 202, 607 N.Y.S.2d 227, 231 (1994) (statements of belief are "generally considered, not actionable statements of fact, but mere opinion and puffery"); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 811 (2d Cir.1996) (generally statements that a

company was optimistic about its prospects were "puffery" that could not mislead a reasonable investor and "cannot constitute actionable statements under the securities laws").

**182.** *Hydro Investors, Inc.,* 227 F.3d at 20.

ures in that respect were, if anything, likely to lead a reasonable acquiror to place less reliance on the Rawhide Projections, rather than more. Put simply, it is odd to posit a stranger scheme to mislead than the one IBP supposedly carried out. The scheme involved behaving in a manner that would naturally lead IBP's negotiating adversary to be skeptical and on notice of possible problems. In any event, by the critical point in time IBP had given Tyson all the information it needed to assess the Rawhide Projections and their inherent unreliability.

Finally, I conclude that Tyson did not reasonably rely to its detriment on the Rawhide Projections. By the time it signed the Merger Agreement, Tyson had come to the conclusion that IBP management could not be trusted, particularly Shipley, who they knew prepared the Projections. To make sure that they were making a sound deal, Tyson had its investment banker run downside cases using numbers much lower than were contained in the Projections. By the time it signed the Merger Agreement, Tyson's investment banker doubted whether DFG had ever made money, and its CFO, Hankins, was openly skeptical of IBP's ability to meet the Projections. John Tyson believed that Foodbrands was broken. Despite all these risk factors, Tyson proceeded without securing any written representation and warranty giving Tyson the right to walk away if IBP did not perform in the first quarter of FY 2001 on a pace to meet the Rawhide Projection for that year. Nor did Tyson seek to escrow a portion of the Merger consideration, pending IBP's performance in 2001.

Notably, in January 2001, Tyson's Cash Offer documents reprinted the Rawhide Projections, revised as of December 20, 2000. In so doing, Tyson warned as follows:

*The Company has advised us that it does not as a matter of course make public forecasts as to future revenues, earnings or other financial information,* and the Projections were not prepared with a view to public disclosure.

\* \* \*

The Projections were not prepared with a view to public disclosure or compliance with published guidelines of the SEC or the American Institute of Certified Public Accountants regarding prospective financial information. In addition, the Projections were not prepared with the assistance of or reviewed, compiled or examined by, independent auditors. *The Projections reflect numerous assumptions, all made by the Company management, with respect to industry performance, general business, economic, market and financial conditions and other matters, all of which are difficult to predict and many of which are beyond the Company's control. Accordingly, there can be no assurance that the assumptions made in preparing the Projections will prove accurate, and actual results may be materially greater or less than those contained in the Projections.*

*The inclusion of the Projections in this Supplement to the Offer should not be regarded as an indication that the Company, Tyson or Purchaser or any of the Company's, Tyson's or Purchaser's respective representatives, or respective officers and directors, consider such information to be an accurate prediction of future events or necessarily achievable. In light of the uncertainties inherent in forward looking information of any kind, we caution against reliance on such information.* The Company has advised us that it does not intend to

update or revise the Projections to reflect circumstances existing after the date when prepared or to reflect the occurrence of future events, unless required by law.[183]

For all these reasons, the Rawhide Projections provide IBP with no basis to rescind the Merger Agreement or the Confidentiality Agreement.[184]

### 2. Tyson Cannot Base Rescission On Any Deficiencies In The Due Diligence Process Regarding DFG

Tyson's next argument is that it was misled by IBP about the health of Foodbrands, and that it was denied access to full due diligence regarding that part of IBP. This argument is unavailing for several reasons.

■ First, the assertion is barred by the Confidentiality Agreement, which prohibits a claim based on a due diligence omission. No representation or warranty in the Merger Agreement specifically covers this contention.

Second, IBP did not deny Tyson access to due diligence about Foodbrands. It told Tyson that the cost of access was permitting Smithfield to see the same information. Tyson has not proven that IBP management thought there were problems outside of DFG as of December 2000 and decided to deny Tyson access to information so as to conceal them.

Third, I conclude that Hagen did not intentionally mislead Tyson about whether it had received audit reports about all units of IBP. Tyson's request was directed to the "company" and was never more

specific. Tyson never asked for audit reports specific to DFG or Foodbrands after being told that it had received all audit reports for the company. The type of misunderstanding that emerged between Hudson and Hagen is typical of those that are common in discovery disputes. Given the large volume of information Hagen turned over, I cannot infer that she purposely hid any particular audit reports from Tyson. Hudson could have followed up if he wanted Foodsbrand-specific audit reports and had not received any. Persistence by the requesting party is expected when huge volumes of information are being produced in a hurry.

Lastly, any failure on Hagen's part did not cause Tyson to sign the Merger Agreement under a misapprehension of material fact. The Brady memorandum regarding DFG is the only potentially material audit report that Tyson complains Hagen failed to provide. But that memorandum contains no information that, in words or substance, was not communicated to Tyson before it signed the Merger Agreement. By the time it signed on the dotted line, Tyson doubted that DFG would contribute in FY 2001, and knew that a company with only $70 million in sales had caused an over $30 million loss, that IBP still had not figured out how to account for the problem, and was still studying whether an impairment was necessary. Tyson also knew that this problem had been caused by fraud that had gone on for a lengthy period, without detection by IBP's top management. In part because of these events, Tyson lacked confidence in IBP's

---

183. PX 165 (emphasis added).

184. As to the Confidentiality Agreement, Tyson cannot base rescission on any failure on IBP's part to inform Tyson before December 28, 2000 that IBP would not hit the Rawhide target for FY 2000. For one thing, the oral cautions Tyson had received, the disclaimers

in the Rawhide Proxy, and results reported in IBP's third quarter 10–Q made any prior reliance unreasonable. Even more important, Tyson expressly reaffirmed the Confidentiality Agreement by signing the Merger Agreement. See Agreement § 7.08.

CFO at the time it signed the Merger Agreement.

In view of what Tyson knew, anything in the Brady memorandum would have been merely cumulative.[185] The key is that IBP told Tyson about the problems identified in that memorandum. And given Tyson's decision to increase its bid after learning of the deepening problems at DFG and its acceptance of Schedule 5.11, Tyson's argument that it would not have signed the Merger Agreement if it had seen the Brady memorandum is meritless.

### 3. *Tyson Cannot Base Rescission On The Comment Letter*

Tyson argues that it was misled into signing the Merger Agreement because of IBP's failure to disclose the Comment Letter. Earlier in this litigation, Tyson argued that IBP's failure to turn over the Comment Letter was intentional. Tyson has dropped that claim and contends that the failure was an actionable innocent omission of a material fact. For reasons discussed, this argument is barred by the Confidentiality Agreement. Even if not barred by that Agreement, this argument is without merit.

■ As is obvious, Tyson's Comment Letter claim is not based on any statement that IBP made to Tyson. It is based on IBP's failure to disclose the Letter. IBP was not Tyson's fiduciary during the contractual negotiations. It had no special duty to provide Tyson with the Comment Letter, even assuming it had focused on the Letter before the Agreement was executed—which neither it nor its attorneys had.

The fact that IBP had no duty to disclose the Comment Letter to Tyson is perhaps best illustrated by Tyson's own behavior. In the weeks preceding the Merger Agreement's execution, Tyson had corresponded with the SEC about issues that IBP would have found interesting. Tyson never turned this correspondence over to IBP. *In fact, after the Merger Agreement was signed, Tyson breached its obligation to turn over SEC correspondence to IBP at the same time as it was complaining about the Comment Letter.*[186] Tyson's own behavior demonstrates that the parties were dealing with each other at arms' length, and that no special duty of disclosure had arisen. For this reason alone, Tyson's rescission claim fails.[187]

■ As important, there is no basis to infer that Tyson would not have signed the Merger Agreement if it had seen the Comment Letter.[188] The Comment Letter

---

**185.** Tyson claims that Brady's opinion that DFG was not viable as currently configured is material because it contradicts what Bond told it. But Bond's statement that DFG is a viable business was, I conclude, his true belief and was premised on the sort of reconfiguration that Brady mentioned. Tyson knew that IBP was trying to turn around DFG and that there was no guarantee of success. Indeed, Tyson was skeptical that Bond would succeed. Don Tyson later told Bond to just "blow the thing up."

**186.** *See* Agreement § 2.01(e), (h).

**187.** *Brass,* 987 F.2d at 150. The *Brass* case states that a duty to speak arises during arms' length bargaining only where a party possess-

es superior knowledge that is not readily available to the other, and knows that the other is acting on mistaken knowledge. *Id.* In this case, IBP's negotiators had no actual knowledge of the contents of the Comment Letter, Tyson had flagged all the issues covered by that Letter and was thus not at a disadvantage, and IBP had no reason to believe that Tyson was acting on the basis of a mistaken belief about anything. *See also* 60 N.Y. Jur.2d *Fraud & Deceit* § 2.

**188.** Tyson's arguments that the Comment Letter would have been a show-stopper strain credulity. Lederman suggested that Tyson would have boycotted the auction if it had known that the SEC would question the pool-

flagged no issues that Tyson had not already identified and concluded were not obstacles to going forward with the Merger Agreement.[189] As of December 29, 2000, Tyson had far more knowledge than the SEC had about the issues raised in the Letter—especially DFG.

■ In the face of a grandstand full of waving red flags, Tyson sped into the final round of the negotiation process. The Comment Letter would not have slowed it down. This conclusion is best demonstrated by the fact that Tyson's board and stockholders voted to approve the Merger Agreement *after* Tyson had received the Comment Letter.[190] Tyson's top management deemed the Letter too insignificant—*i.e.*, *immaterial* [191]—to share with the board or the stockholders.[192]

---

ing treatment given the CFBA merger. He would have counseled doing so because pooling was important to Smithfield. But Smithfield dropped any pooling condition to its offer and Tyson had already identified pooling as an issue. In the end, the SEC—which questions pooling whenever it sees it—agreed that IBP's accounting for the CFBA transaction was proper.

Tyson also contended that Stephens, Inc. would not have given it a fairness opinion if it had known about the Comment Letter, because that Letter raised such serious issues. But Stephens' witness indicated that he had never been told by Tyson about the $30–35 million in charges to earnings expected at DFG, the fact that the accounting problems at DFG were still not resolved, and that they resulted from fraud by DFG's former top manager. The witness indicated that he would not have given an opinion if he had known those facts, either. Tyson, however, evidently viewed those facts as so inconsequential that it did not tell Stephens about them.

**189.** Tyson has attempted to show that the Comment Letter is out of the ordinary. I am not convinced, given the expert testimony to the contrary. The Comment Letter largely addresses SEC hot topics and the serious DFG situation that required a restatement. Tyson's own CFO testified that many of the SEC's concerns were trivial accounting nits.

**190.** *Cf. Barrier Systems, Inc. v. A.F.C. Enterprises, Inc.*, 264 A.D.2d 432, 694 N.Y.S.2d 440, 442 (1999) (rescission claim failed where plaintiff learned of alleged fraud and then affirmed agreement); Restatement (Second) of Contracts § 380(2) (1979) ("The power of party to avoid a contract for mistake or misrepresentation is lost if after he knows or has reason of the mistake or of the misrepresentation ... he manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance.").

**191.** In a footnote in its opening brief, Tyson argues that the Merger Agreement should be rescinded on grounds of unilateral or mutual mistake. These arguments are unpersuasive for two reasons. First, it is inconceivable that the issues that Tyson raises are fundamental enough to constitute a "mistake" were not fundamental enough to manifest themselves in the text of the extensively negotiated Merger Agreement. For example, Tyson premises its mistake claim in part on the failure of the Rawhide Projections to come true in 2001. Yet, as of the time of contracting, Tyson knew that those Projections had already been well off the mark in 2000 and did not seek a specific representation and warranty or escrow tied to the accuracy of the Projections. Tyson has simply not met the heavy burden required under New York law to set aside a contract for mutual or unilateral mistake. *See Shults v. Geary*, 241 A.D.2d 850, 660 N.Y.S.2d 497, 499 (1997) (discussing standard for mutual mistake); *Long v. Fitzgerald*, 240 A.D.2d 971, 659 N.Y.S.2d 544, 547 (1997) (discussing standard for unilateral mistake).

Second, "[a] party who desires to rescind a contract upon the ground of mistake must, upon discovery of the facts, announce at once his purpose and adhere to it. A failure to notify immediately the other party of the mistake may amount to a waiver of any objection or a ratification of the mistake." 22 N.Y. Jur.2d *Contracts* § 131 (1996). Tyson's belated cry of mistake comes far too late to be fairly asserted.

**192.** *See also* PX 183 (e-mail indicating that Tyson and its auditors had assured lenders that the Comment Letter would not affect the *pro forma* numbers Tyson had given to lend-

## F. *IBP Has Not Proven That Tyson's Termination Of Its Cash Offer Breached The Agreement*

The final merits issue I must examine is IBP's contention that Tyson's first breach of contract occurred no later than February 28, 2001, when Tyson did not close on its Cash Offer.[193] As of that time, the minimum tender condition of 50.1% of the IBP shares had been easily met and Tyson had obtained Hart–Scott–Rodino clearance. For the reasons discussed, Tyson did not have a basis to terminate as of that date in reliance on the Agreement's representations and warranties, because none of them were breached. Even more important, Tyson was required by Annex I of the Agreement to make a reasonable good faith judgment that a representation and warranty was breached as of the time it decided not to close the Cash Offer. As Baledge testified, Tyson had not made any such good faith determination.

Therefore, Tyson must rely on some other basis to excuse its failure to close the Cash Offer. The basis that Tyson asserts is that IBP's failure to formally file the Restated Financials in time for Tyson to amend its Cash Offer Documents made it impossible for Tyson to comply with the relevant SEC regulations and thus to close. In support of this argument, Tyson cites to SEC regulations and guidance, which state that "[p]ro forma financial information is required in a negotiated third-party cash tender offer when securities are intended to be offered in a subsequent merger or other transaction in which remaining target securities are ac-

quired and the acquisition of the subject company is significant to the offeror ...." [194] Tyson was subject to this requirement because IBP stockholders who did not elect to tender into the Cash Offer would receive Tyson stock in the Exchange Offer or ultimate Merger. Therefore, Tyson's Cash Offer documents contained *pro forma* information that was based on the original Warranted Financials. As a result, Tyson contends that it had no choice but to refuse to close, because IBP did not formally file the Restated Financials until after the contractual expiration of the Cash Offer on February 28, 2001. To the extent that any party is at fault, Tyson says, it is IBP, which failed to provide corrected financial information pursuant to § 2.01(e) in sufficient time to allow Tyson to update its Cash Offer documents and close on February 28.

In January and February, Tyson put IBP on notice that it was awaiting the outcome of IBP's SEC discussions before updating its Cash Offer documents. In this regard, Tyson notes that IBP never demanded that Tyson update those documents on the basis of interim information that was not contained in formally Restated Financials. Indeed, once Tyson terminated, IBP issued a press release stating that Tyson's termination of the Cash Offer was "in complete accordance with the" Merger Agreement.[195]

IBP's response hinges largely on § 9.02 of the Agreement, which imposed on Tyson the duty to use its "reasonable best efforts" to close the Cash Offer. According to IBP, Tyson breached this duty be-

---

ers regarding the combination); PX 181 (Tyson officer's certificate signed by Leatherby to a banking syndicate indicating that Tyson was unaware of any material adverse condition that had occurred at IBP since 9/30/00).

193. The shareholder plaintiffs advanced this argument, and have permitted IBP to take the

lead in presenting it, as well as the other issues in the case, to this stage.

194. SEC Schedule TO (Rule 14d–100, Item 10, Instruction 5) (1999).

195. PX 274.

cause it took no steps to use the information that it possessed before February 28, 2001 to construct *pro forma* information that, with the inclusion of appropriate qualifications, would pass muster under the SEC regulations. For example, IBP says that Tyson possessed drafts of the Restated Financials in early February.[196] Not only that, Tyson had received a copy of a February 7, 2001 SEC letter to IBP, which indicated that the SEC would not decline to accelerate the effectiveness of a registration statement for Tyson's Exchange Offer, so long as the statement included the restated financial statements.[197] Even if that earlier information was not sufficient, IBP notes that it publicly disclosed the substantive aspects of the Restated Financials on February 22, 2001, including the quarters to which the DFG charges would be allocated.[198] This disclosure also indicated that an asset impairment of up to $108 million could be taken, and discussed the effect that variable option plan accounting would have.

IBP therefore argues that if Tyson had used "reasonable best efforts" it could have constructed *pro forma* information that met the requirements of the SEC Regulations, and disclosed that information in time for it to close the Cash Offer on February 28, 2001. In early February, Hagen had called Baledge to discuss moving forward with the Cash Offer on the basis of this information. Baledge never responded to her request.

IBP contends that the reason that Baledge never responded has now become clear, and evidences a breach of § 9.02: Tyson was trying to stall for time so that Don Tyson could see more IBP results from 2001 before deciding whether to proceed, renegotiate, or terminate. The evidence does support the conclusion that Tyson's principal motivation was delay for reasons that had to do with Tyson's own weakened financial condition and IBP's weak first quarter, rather than any of the issues pending before the SEC.

■ Yet, during February 2001, Tyson did not tell IBP that its most important reason for not proceeding with the Cash Offer had nothing to do with the SEC issues. Instead, it issued public statements indicating that it was committed to the transaction's prompt consummation, but wished to assess the materiality of any restatements resulting from the SEC process. Indeed, on February 21, 2001, John Tyson publicly reiterated that Tyson was "going to buy IBP," that it was "a unique point in time and opportunity to create the world's largest marketer of these proteins," and that "IBP is a strong company."[199] As a result, IBP says it was lulled into a sense of false security that led it to refrain from demanding that Tyson speed up its efforts to close the Cash Offer. Had Tyson disclosed its real motives, IBP would have acted differently. IBP's public indication that Tyson's termination of the Cash Offer comported with the Agreement must be understood in context: IBP was expressing its reliance on the good faith of a merger partner who it thought was exercising best efforts. Therefore, its press release cannot be regarded as an enforceable waiver of any breach on Tyson's part.

My ability to resolve the competing arguments of Tyson and IBP is compromised by the murky nature of the governing administrative law that has been cited to me. As a general matter, there seems to be no dispute that Tyson had a duty to

**196.** PX 232.

**197.** PX 237.

**198.** PX 263.

**199.** PX 258.

present *pro forma* financial information, and no question that its presentation should be as accurate as possible. Beyond that, the parties basically give me opinion testimony about how the SEC would treat this kind of question. Tyson says that the SEC wants tender offerors to get it right, and that it is not adequate to simply set forth *pro forma* information and indicate that there could be deviations based on unaudited numbers in the target's press releases. IBP contends that the SEC is more flexible than that, and that if Tyson had constructed *pro formas* that factored in the information in the draft restatements provided to Tyson in early February, this would have sufficed to meet any fair disclosure obligation. IBP also adds that it was ludicrous for Tyson to fear litigation, because it is difficult to conceive how IBP shareholders could have been injured by a disclosure of a *pro forma* balance sheet, adjusted by the information in the draft restatements and coupled with an indication that an asset impairment of up to $108 million could be taken at a later time.

My suspicion is that a motivated tender offeror, working with a cooperative target and the target's accountants, could have put together Cash Offer documents that would have satisfied SEC standards and presented no likelihood of serious litigation risk based on the information that Tyson had in its possession in early to mid-February. This would have required a collaborative effort with the target and discussions with the SEC, but it probably could have been done. That's my guess.

And that's my problem. IBP is hinging its present argument on several "could have been" scenarios that I am not well-positioned to evaluate with the certainty that is required to sustain a finding of

contractual breach. Under the Agreement, IBP had the primary duty here, to provide Tyson with corrected information that would allow the Cash Offer to close. Although IBP hinted that Tyson could proceed with interim information in advance of the final Restated Financials, it never demanded that Tyson do so, and it never asked Tyson to request the SEC's permission to go forward on that basis. Thus, IBP asks me to speculate that it was commercially unreasonable for Tyson to wait until it had certified restatements before proceeding.

While it is troubling that Tyson used IBP's troubles with the SEC to prospect for more time, I am not sufficiently persuaded that it was unreasonable for Tyson to await the formally Restated Financials before proceeding. Indeed, the SEC's February 7, 2001 letter to Hagen is at best ambiguous about whether the SEC was willing to permit a registration statement based on draft restatements, rather than filed restatements. And although more complete information was publicly released by IBP on February 22, 2001, that was a very short time before the Cash Offer deadline and IBP has not convinced me that it was practical for Tyson to amend its *pro forma* information, and disclose that information in time for IBP stockholders to consider it in their decision-making process by the deadline. Therefore, I conclude that Tyson did not breach the Agreement, or any duty to the IBP stockholders, by failing to close the Cash Offer on February 28, 2001.

As a result of this conclusion, my merits determination is that Tyson is in breach of the Merger Agreement because it improperly terminated in late March, 2001. That is, it is in breach of its obligation to close the Cash Election Merger on or before

May 15, 2001.[200]

### IV. *IBP Is Entitled To An Award Of Specific Performance*

Having determined that the Merger Agreement is a valid and enforceable contract that Tyson had no right to terminate, I now turn to the question of whether the Merger Agreement should be enforced by an order of specific performance. Although Tyson's voluminous post-trial briefs argue the merits fully, its briefs fail to argue that a remedy of specific performance is unwarranted in the event that its position on the merits is rejected.

This gap in the briefing is troubling. A compulsory order will require a merger of two public companies with thousands of employees working at facilities that are important to the communities in which they operate. The impact of a forced merger on constituencies beyond the stockholders and top managers of IBP and Tyson weighs heavily on my mind. The prosperity of IBP and Tyson means a great deal to these constituencies. I therefore approach this remedial issue quite cautiously and mindful of the interests of those who will be affected by my decision.

■ I start with a fundamental question: is this is a truly unique opportunity that cannot be adequately monetized? If the tables were turned and Tyson was seeking to enforce the contract, a great deal of precedent would indicate that the contract should be specifically enforced.[201]

---

**200.** Throughout the course of this case, IBP has urged upon me another proposition that it believes compels a ruling in its favor. IBP asserts that under New York law, a party cannot refuse to close on a contract in reliance upon a breached contractual representation if that party knew that the representation was false at the time of contracting. Put directly, IBP says it can win this case even if there was a breach of a representation in the Merger Agreement so long as it can prove that it informed Tyson of facts that demonstrate that the representation was untrue and thus that Tyson did not in fact rely upon the representation in deciding to sign the Merger Agreement. IBP's arguments find some support in some cases applying New York law. *See, e.g., Rogath v. Siebenmann*, 129 F.3d 261, 264–65 (2d Cir.1997) ("Where the seller discloses up front the inaccuracy of certain of his warranties, it cannot be said that the buyer— absent the express preservation of his rights— believed he was purchasing the seller's promise as to the truth of the warranties."). There is, however, no definitive authority from the New York Court of Appeals to this effect, and the leading case can be read as being at odds with IBP's position. *See CBS v. Ziff–Davis Publishing Co.*, 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997, 1000–01 (1990). Most of IBP's cases also deal with a distinct context, namely situations where a buyer signed the contract on day one, learned that a representation is false from the seller on day three, closed the contract on day five, and sued for damages for breach of warranty on day 10. The public policy reasons for denying relief to the buyer in those circumstances are arguably much different than are implicated by a decision whether to permit a buyer simply to walk away before closing in reliance on a specific contractual representation that it had reason to suspect was untrue as of the time of signing. In any event, my more traditional contract analysis applies settled principles of New York contract law and eliminates any need to delve into these novel issues of another state's law.

Likewise, there is no present need to address IBP's other arguments, which are grounded in equitable doctrines such as estoppel, acquiescence, and waiver and ratification. Nor do I address IBP's argument that Tyson breached the Agreement's implied covenant of good faith and fair dealing by terminating for pretextual reasons (*i.e.,* DFG and the Comment Letter) that had no relationship to Tyson's actual motives (*i.e.,* Tyson's alleged desire to renegotiate the deal to a much lower price or terminate because of its own poor performance).

**201.** 96 N.Y. Jur.2d *Specific Performance* § 50 (1992) ("Courts of equity have decreed specific performance of contracts for the sale of a business, particularly where an award of damages would have been inadequate or impracticable.").

In the more typical situation, an acquiror argues that it cannot be made whole unless it can specifically enforce the acquisition agreement, because the target company is unique and will yield value of an unquantifiable nature, once combined with the acquiring company.[202] In this case, the sell-side of the transaction is able to make the same argument, because the Merger Agreement provides the IBP stockholders with a choice of cash or Tyson stock, or a combination of both. Through this choice, the IBP stockholders were offered a chance to share in the upside of what was touted by Tyson as a unique, synergistic combination. This court has not found, and Tyson has not advanced, any compelling reason why sellers in mergers and acquisitions transactions should have less of a right to demand specific performance than buyers, and none has independently come to my mind.

In addition, the determination of a cash damages award will be very difficult in this case. And the amount of any award could be staggeringly large. No doubt the parties would haggle over huge valuation questions, which (Tyson no doubt would argue) must take into account the possibility of a further auction for IBP or other business developments. A damages award can, of course, be shaped; it simply will lack any pretense to precision. An award of specific performance will, I anticipate, entirely eliminate the need for a speculative determination of damages.[203]

Finally, there is no doubt that a remedy of specific performance is practicable. Tyson itself admits that the combination still makes strategic sense. At trial, John Tyson was asked by his own counsel to testify about whether it was fair that Tyson should enter any later auction for IBP hampered by its payment of the Rawhide Termination Fee. This testimony indicates that Tyson Foods is still interested in purchasing IBP, but wants to get its original purchase price back and then buy IBP off the day-old goods table. I consider John Tyson's testimony an admission of the feasibility of specific performance.[204]

Probably the concern that weighs heaviest on my mind is whether specific performance is the right remedy in view of the harsh words that have been said in the course of this litigation. Can these management teams work together? The answer is that I do not know. Peterson and Bond say they can. I am not convinced, although Tyson's top executives continue to respect the managerial acumen of Peterson and Bond, if not that of their financial subordinates.

What persuades me that specific performance is a workable remedy is that Tyson will have the power to decide all the key

**202.** The United States Court of Appeals for the Third Circuit has issued a thoughtful opinion to this effect, in a case dealing with a merger agreement between two public companies. *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153 (3d Cir.1999); *see also C & S/Sovran Corp. v. First Fed'l Savings Bank of Brunswick,* 266 Ga. 104, 463 S.E.2d 892, 894–96 (1995) (specifically enforcing merger agreement between two publicly traded banks). This court has embraced this reasoning on many occasions. *See, e.g., True North Communications, Inc. v. Publicis, S.A.,* Del. Ch., 711 A.2d 34, 45, *aff'd,* Del.Supr., 705 A.2d 244 (1997). Indeed, this premise is a foundation of this State's jurisprudence in the takeover area, as exemplified by *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del. Supr., 506 A.2d 173, 184–85 (1986).

**203.** The parties need to consider the issue of how any delay in payment of the Merger consideration plays into an award of specific performance.

**204.** It may also be Tyson's preference, if it has to suffer an adverse judgment. Any damages award will be huge and will result in no value to Tyson.

management questions itself. It can therefore hand-pick its own management team. While this may be unpleasant for the top level IBP managers who might be replaced, it was a possible risk of the Merger from the get-go and a reality of today's M & A market.

The impact on other constituencies of this ruling also seems tolerable. Tyson's own investment banker thinks the transaction makes sense for Tyson, and is still fairly priced at $30 per share. One would think the Tyson constituencies would be better served on the whole by a specific performance remedy, rather than a large damages award that did nothing but cost Tyson a large amount of money.

In view of these factors, I am persuaded that an award of specific performance is appropriate, regardless of what level of showing was required by IBP. That is, there is clear and convincing evidence to support this award. Such an award is decisively preferable to a vague and imprecise damages remedy that cannot adequately remedy the injury to IBP's stockholders.

## V. *Conclusion*

For all the foregoing reasons, IBP's claim for specific performance is granted. Tyson's claims for relief are dismissed. The parties shall collaborate and present a conforming partial final order no later than June 27. In addition, the parties shall schedule an office conference with the court to occur later that same week.